United States Court of Appeals,

Fifth Circuit.

No. 91-3363.

LYNDA D. PERRY, Plaintiff-Appellant,

v.

MERCEDES BENZ OF NORTH AMERICA, INC. and ABC INSURANCE COMPANY,
Defendants-Appellees.

April 10, 1992.

Appeal from the United States District Court for the Middle
District of Louisiana.

Before REAVLEY, HIGGINBOTHAM and DeMOSS, Circuit Judges.

REAVLEY, Circuit Judge:

Lynda D. Perry contends that Mercedes Benz of North America
(MBNA) defectively designed or defectively constructed the air bag
system that was installed in Perry's automobile. The district
court granted summary judgment for MBNA, 761 F.Supp. 437, holding
that federal law preempts Perry's defective design claim and that
Perry's evidence raised no genuine issues of material fact to
support her claim of defective construction. We decide that
summary judgment was proper on the defective construction claim.
But we hold that federal law does not preempt Perry's design claim,
and we remand the case for further proceedings.


I. BACKGROUND

Perry was injured in East Baton Rouge Parish, Louisiana, on
March 4, 1986, when she lost control of her 1986 Mercedes Benz 190E
and drove it into a ditch. Perry initially failed to notice a stop
sign where the street that she was on dead-ended into another

street, forming a "T" intersection.  Once she saw the stop sign, Perry noticed a car approaching the intersection from her right. Thinking that she would not be able to stop in time to avoid the oncoming car, Perry decided to proceed through the intersection. The driver of the other car, deputy sheriff James Todd Morris, was able to avoid Perry's car, but Perry continued through the intersection and into the ditch on the other side.  Perry's Mercedes was equipped with a driver's side air bag, but the air bag did not inflate on impact.  Perry, who was not wearing a seat belt, struck the steering wheel or windshield and received facial lacerations and damage to her teeth and mouth.  The parties dispute how fast Perry's car was traveling at the time of impact.

On February 27, 1987, Perry filed this suit against MBNA in Louisiana state court, alleging that the failure of the air bag to inflate caused Perry $500,000 in damages.  MBNA removed this diversity case and moved for summary judgment.  The district court granted MBNA's motion and held that:  (1) federal law preempts Perry's defective design claim, and (2) Perry failed to raise an issue to support her claim of defective construction.

## II. DISCUSSION

A. Federal Preemption of the Defective Design Claim

As the basis for her defective design claim, Perry alleges that MBNA designed its air bag systems with an unreasonably

dangerous "deceleration velocity deployment threshold."[1]  Under
Louisiana products liability law as it existed when Perry filed
this suit,[2] a product is considered unreasonably dangerous in
design if the "danger-in-fact" of the product outweighs the utility
of the product, or if the product could have been designed or
replaced with an alternative product with less risk of harmful
consequences. *See Halphen v. Johns–Manville Sales Corp.,* 484 So.2d
110, 115 (La.1986).  Essentially, Perry claims that MBNA is liable
for her damages because it should have designed the air bag system
to deploy upon the type of impact that Perry's vehicle sustained.
MBNA argued, and the district court agreed, that federal
regulations promulgated under the National Traffic and Motor
Vehicle Safety Act of 1966 (the Safety Act or the Act), 15 U.S.C.

---

[1]The airbag system's "deceleration velocity deployment
threshold" determines the force that must be caused by the
vehicle's sudden deceleration to trigger inflation of the airbag.
MBNA designed the system in Perry's vehicle with a minimum
threshold of twelve miles per hour against a rigid barrier.

[2]In 1988, the Louisiana legislature enacted the Louisiana
Products Liability Act, LA.REV.STAT.ANN. §§ 9:2800.51–.59 (West
1991), which provides that a plaintiff who seeks to prove that a
product is unreasonably dangerous in design must prove that,

> at the time the product left its manufacturer's
> control:
>
> (1) There existed an alternative design for the
> product that was capable of preventing the claimant's
> damage;  and
>
> (2) The likelihood that the product's design would
> cause the claimant's damage and the gravity of that
> damage outweighed the burden on the manufacturer of
> adopting such alternative design and the adverse
> effect, if any, of such alternative design on the
> utility of the product.

LA.REV.STAT.ANN. § 9:2800.56.

§§ 1381-1431, preempt Perry's state law defective design claim.

*1. The Safety Act and the Regulatory Scheme.*

Congress' express purpose for enacting the Safety Act over twenty-five years ago was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381. To achieve this purpose, the Act delegates to the Secretary of Transportation the authority to establish "motor vehicle safety standards" (MVSS) that provide practical and objective minimum standards for the performance of motor vehicles and their equipment. *Id.* §§ 1391(2), 1392(a). The Secretary, in turn, delegated this duty to the National Highway Transportation Safety Administration (NHTSA). *See* 49 C.F.R. § 501.2. The NHTSA fulfilled its responsibility by promulgating the MVSS published at 49 C.F.R. §§ 571.1-.302.

The MVSS that is relevant to this case is 49 C.F.R. § 571.208 (Standard 208), which is entitled "Occupant Crash Protection." In Standard 208, the NHTSA set forth mandatory minimum "performance requirements" for automobile crash protection systems, without requiring the use of any single particular system or design.[3] The

---

[3]For various recitals of the "complex and convoluted history" of Standard 208, *see Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 34-38, 103 S.Ct. 2856, 2862-64, 77 L.Ed.2d 443 (1983); *Wood v. General Motors Corp.,* 865 F.2d 395, 398-99 (1st Cir.1988), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990); *Taylor v. General Motors Corp.,* 875 F.2d 816, 823 (11th Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); Keith C. Miller, *Deflating the Airbag Pre-emption Controversy,* 37 EMORY L.J. 897,

NHTSA has considered requiring the installation of air bags and the use of particular designs in all vehicles, but has chosen not to do so. *See* 49 Fed.Reg. 28,982, 29,001 (1984). Instead, Congress and the NHTSA sought to ensure the minimum protection of occupants while allowing manufacturers to develop better systems through competition in the automobile industry. *See* S.REP. No. 1301, 89th Cong., 2d Sess. 1, 4 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2712.

To meet the performance requirements of Standard 208, a manufacturer may choose from options that include both manual restraints (which require the occupant to act in some way to receive the protection) and passive restraints (which require no action by the occupant). Air bags and automatic seat belts are the most common forms of passive restraints. Standard 208 S4.1.2, which applies to the vehicle that Perry was driving, requires the manufacturer to choose one of three occupant restraint systems: (1) a complete passive protection system for frontal and lateral crashes (e.g., automatic seat belts with or without air bags); (2) passive protection for frontal crashes (e.g., an air bag) plus lap belts for lateral crashes and rollovers with a seat belt warning system; or (3) manual lap and shoulder belts with a seat belt warning system. *See Kitts v. General Motors Corp.,* 875 F.2d 787, 788 n. 2 (10th Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990). If a manufacturer chooses an option that includes the use of air bags or other passive restraints, the

_____

901–09 (1988).

vehicle must meet the protection requirements set forth in Standard 208 S5.1–.3 for frontal, lateral, and rollover crashes. These requirements mandate that, following an "impact ... up to and including 30 mph, into a fixed collision barrier," an anthropomorphic test dummy must meet or exceed certain "Injury Criteria" specified in Standard 208 S6.

The system that MBNA chose to install in the vehicle that Perry was driving included both an air bag and a lap and shoulder seat belt. Thus, federal law required MBNA to design the system to meet the protection requirements and injury criteria of Standard 208 S5 and S6. Perry does not allege that the vehicle she was driving failed to meet these requirements. Instead, she claims that the vehicle was defectively designed because the likelihood of the injuries that she suffered outweighed the burden that adopting a safer system would place on the manufacturer, and thus it was unreasonably dangerous under Louisiana products liability law.

The Safety Act includes two sections that are particularly important to our determination of whether the Act and its regulations preempt Perry's state law design claim. The first is the "Preemption Clause," which provides:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, *no State or political subdivision of a State* shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

15 U.S.C. § 1392(d) (emphasis added).  The second important section is the "Savings Clause," which states:

> Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any *liability under common law.*

*Id.* § 1397(k) (emphasis added).  We must determine whether the Preemption Clause prohibits Perry's claim or the Savings Clause allows it.

*2. The Federal Preemption Doctrine.*

The Supreme Court has "held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).  The question of whether federal statutes or regulations preempt state law under the Supremacy Clause of the Constitution is essentially a question of congressional intent.  *California Fed. Sav. and Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987).  The Court in *Guerra* summarized the three ways that Congress may express its intent to preempt state law:

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in *express* terms.  Second, congressional intent to pre-empt state law in a particular area may be *inferred* where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation....  As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually *conflicts* with federal law.  Such a conflict

occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* at 280–81, 107 S.Ct. at 689 (citations omitted) (emphasis added); *see also Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988). Thus, federal law may give rise to *express, implied (or inferred), or conflict* preemption of state law.

We do not hesitate to find preemption when Congress has *expressly* stated its intent. But we have a general hesitancy to *infer* a preemptive intent. Especially as to state regulation of matters of health and safety, "we start with the assumption that the historic police powers of the States were not to be superseded by the [federal law] unless that was the clear and manifest purpose of Congress." *Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Finally, we do not begin with an assumption against *conflict* preemption, for " "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.' " *Felder v. Casey,* 487 U.S. 131, 138, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123 (1988) (quoting *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962)).

*3. Related Case Law.*

No court has addressed the particular issue in this case. Several courts, including four federal circuits, have considered the related question of whether the Safety Act and its regulations preempt a state tort action that is based on a manufacturer's *failure to install* an air bag system in its cars.[4] This case takes us a step beyond those by asking whether tort liability is preempted when a plaintiff alleges that the air bag system that a manufacturer chose to install is defectively designed under state law. Nevertheless, we find guidance in the failure-to-install cases.

The First Circuit was the first circuit to consider the issue, in *Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir.1988). Patricia Wood was rendered quadriplegic in an accident involving a Chevrolet Blazer. The Blazer was equipped with seat belts and complied with all MVSS, but Wood was not wearing a belt at the time of the accident. Wood claimed that General Motors was liable for her injuries because it defectively designed the Blazer by equipping it with seat belts instead of air bags. The First Circuit rejected General Motors' argument that the Safety Act *expressly* preempted Wood's claim, but agreed with General Motors that Wood's claim was preempted because, if successful, it would *conflict* with "Congress' chosen method of increasing automobile safety." *Id.* at 412 (emphasis omitted).

---

[4]Some of the many decisions on the failure-to-install issue are listed in *Taylor,* 875 F.2d at 822 n. 13; *Wood,* 865 F.2d at 400 n. 7; and *Welsh v. Century Prod.,* 745 F.Supp. 313, 316 n. 4 (D.Md.1990).

In rejecting the express preemption argument, the court noted that the Preemption Clause prevents a State or political subdivision from establishing non-identical safety standards pertaining to the "same aspect of performance," but the Savings Clause appears to allow common law actions that would have the same effect. *Id.* at 403-07. The court believed that this created an ambiguity that resulted from the fact that, when it passed the Act, "Congress ... did not contemplate the likelihood that there would be a state tort action that would effectively create a state design standard conflicting with a federal safety standard." *Id.* at 403. Because both Clauses, and the relationship between the two, were ambiguous in the context of a state tort standard not identical to the federal standards but pertaining to the same aspect of performance, the court "devine[d] no specific congressional intent in section 1392(d) *expressly* to preempt an action of the present type." *Id.* at 407 (emphasis added).

But the court held that Wood's state law claim was preempted because it would "stand as an obstacle" to—and thus *conflict* with—the Safety Act and its underlying regulations. *Id.* at 408. The court reasoned that: (1) section 1392(d) would expressly preempt a state regulation that required passive restraints, because such a regulation would be applicable to the same aspect of performance as, but not identical to, the federal standard; (2) Wood's state law tort action would have the regulatory effect of requiring passive restraints; and, therefore, (3) because Wood's action "would have the same effect as an impermissible state

regulation, it is preempted because it stands as an obstacle to Congress's chosen method for achieving auto safety." *Id.* The court rejected Wood's argument that the Savings Clause foreclosed the possibility of conflict preemption because it found that Supreme Court cases support the view that "general savings clauses may not be read literally to permit common law actions that contradict and subvert a [federal] scheme." *Id.* at 415 (citing *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 812, 93 L.Ed.2d 883 (1987), and *Texas & Pacific Railway v. Abilene Cotton Oil Co.,* 204 U.S. 426, 436, 27 S.Ct. 350, 353, 51 L.Ed. 553 (1907)).

The Tenth Circuit was next to address the failure-to-install issue in *Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir.1989). With little discussion, the Tenth Circuit followed *Wood,* stating: "Because we believe *Wood* directly addresses and correctly resolves the issue before us, we follow the general principles articulated in *Wood* and adopt the implied preemption rule of the First Circuit." *Id.* at 789.

One month later, the Eleventh Circuit faced the same issue in *Taylor v. General Motors Corp.,* 875 F.2d 816 (11th Cir.1989). Like the First and Tenth Circuits, the *Taylor* court found that the Safety Act does not *expressly* preempt a state tort action based on a manufacturer's failure to install an air bag. *Id.* at 825.[5] But

---

[5]The Eleventh Circuit found unpersuasive the First Circuit's theory that Congress did not contemplate the possibility of a state tort action that would create a state design standard that

the *Taylor* court also agreed that the tort action is impliedly preempted because it would *conflict* with the federal regulatory scheme. Citing the Supreme Court's holding in *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 155, 102 S.Ct. 3014, 3023, 73 L.Ed.2d 664 (1982), that "a state common law rule cannot take away the flexibility provided by a federal regulation, and cannot prohibit the exercise of a federally granted option," the *Taylor* court held that Taylor's state tort claim was preempted because "a state common law rule that would, in effect, remove the element of choice authorized in Safety Standard 208 would frustrate the federal regulatory scheme." *Id.* at 827. Finally, the Eleventh Circuit agreed with *Wood's* determination that "a "general' savings clause, such as that contained in the Safety Act, does not preclude a finding of implied preemption." *Id.* at 827-28 n. 20.

The Third Circuit has issued the latest opinion on the failure-to-install issue. In *Pokorny v. Ford Motor Co.,* 902 F.2d 1116 (3rd Cir.), *cert. denied,* --- U.S. ----, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990), the plaintiff claimed that Ford defectively designed it's Econoline van because it failed to equip the van with air bags, automatic seat belts, or protective netting on the windows. *Id.* at 1117. Like the other circuits, the Third Circuit found that: (1) the Safety Act did not *expressly* preempt Pokorny's state tort claim, *id.* at 1121; (2) the claim that Ford is liable because it failed to install air bags is impliedly preempted

conflicts with the federal standards. *Id.* at 825. But the court rejected General Motors' express preemption argument because the Preemption Clause does not mention state tort actions. *Id.*

because such a state standard would conflict with "the regulatory methods chosen by the federal government to achieve the Safety Act's stated goals," *id.* at 1123; and (3) the Safety Act's general savings clause does not preclude preemption of a state common law standard that conflicts with the federal scheme. *Id.* at 1125 & n. 10. But the Third Circuit emphasized that Pokorny's air bag claim was preempted not simply because federal safety standards have been established to govern the use of air bags, *id.* at 1121, but because Pokorny's air bag claim "presents an actual, clear conflict with federal regulation." *Id.* at 1123. Thus, the Safety Act preempted Pokorny's claims that were based on Ford's failure to install air bags or automatic seat belts, because they would create a state standard that conflicts with the choice that the regulations provide. *Id.* But the court held that the Act did not preempt Pokorny's claim to the extent that it was based on Ford's failure to install protective window netting, because a state standard requiring such netting would not prohibit an option that Standard 208 provides. *Id.* at 1125–26.

*4. Preemption in the Present Case.*

The district court in this case held that, although the Safety Act and its regulations do not *expressly* preempt Perry's defective design claim,[6] they implicitly preempt it because the claim would create a state common law design standard for air bag

---

[6]MBNA does not contest the district court's decision that Perry's design claim is not expressly preempted.

systems and thereby *conflict* with Standard 208's performance standards and the overall federal scheme. We begin our analysis by stating our agreement with the district court that Perry's defective design claim is not *expressly* preempted.[7] In the Preemption Clause, Congress unambiguously expressed its intent to preempt all regulations *by a State or political subdivision of a State* that are applicable to the same aspect of performance as the federal standards but not identical to them. 15 U.S.C. § 1392(d). But Congress was just as unambiguous when it expressed its intent in the Savings Clause not to exempt any person from any *liability under common law. Id.* § 1397(k). So Congress did not *expressly* preempt Perry's claim that MBNA's air bag system was unreasonably dangerous and thus defectively designed under Louisiana law.

Nor do we find that Congress has created a "scheme of federal regulation [that] is sufficiently comprehensive to make reasonable the inference that Congress "left no room' for" Perry's tort claim. *Guerra,* 479 U.S. at 280, 107 S.Ct. at 689. Nothing in the Safety Act or its regulations reveals "the clear and manifest purpose of Congress" to take from the States the power to allow tort liability for unreasonably dangerous air bag systems. *Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376. In fact, the Savings Clause reveals that Congress had the opposite intent.

---

[7]In doing so, we see no need to determine whether Congress may or may not have "overlooked the possibility of the present dilemma" when it wrote the Safety Act. *See Wood,* 865 F.2d at 402.

So we are left with the question of whether the imposition of state-law tort liability for the defective design of an air bag system would *conflict* with federal law.  We think it obvious that there is no conflict in the sense that "compliance with both federal and state regulations is a physical impossibility." *Guerra,* 479 U.S. at 281, 107 S.Ct. at 689.  Federal Standard 208 S4.1.2 provides that, if a manufacturer chooses to install an air bag system, that system must provide a level of protection that meets the *minimum* performance standards specified in S5 and S6.  If a manufacturer is held liable in tort for not designing its system to provide protection greater than that required by the federal standard, the manufacturer can still comply with both the federal standard and the state tort standard by designing its system to meet the latter.

Thus, we are left with the question of whether state tort liability would *conflict* with federal law by standing "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.*  This is the form of preemption that the other circuits found in the failure-to-install cases, based on their belief that tort liability in those cases would interfere with "Congress's chosen *method* as well as ... the ultimate goal of the statute."  *Wood,* 865 F.2d at 408 (emphasis added).  But we find that it would not conflict with Congress' objectives and methods if MBNA were found *liable in tort* for failing to design its air bags to perform in a manner that effectively exceeds the federal minimum standards.  The landmark

for our analysis of this question is the Savings Clause, in which Congress expressly preserved common law liability *even if* the manufacturer complies with the federal standards.  Perry contends that the legislative history of the Safety Act and its Savings Clause discloses Congress' intent that the federal scheme *never* preempt common law liability.  We need not recite that history here,[8] although we find it supportive of Perry's argument, because we find that the Savings Clause itself unambiguously reveals Congress' intent to preserve common law liability.

We are in agreement with the conclusion of the other circuits that the Savings Clause does not preserve common law actions that would *actually conflict with,* or "subvert," the objectives and methods of the federal scheme.  *See Pokorny,* 902 F.2d at 1125 ("it is well-established that a savings clause like § 1397(k) does not "save' common law actions that would subvert a federal statutory or regulatory scheme");  *Taylor,* 875 F.2d at 827-28 n. 20 ("a "general' savings clause, such as that contained in the Safety Act, does not preclude a finding of implied preemption");  *Wood,* 865 F.2d at 415-16 (discussing the "general reluctance ... to follow a savings clause if state law will actually conflict with a federal regulatory scheme").  In reaching this conclusion, those courts found, first, that the imposition of common law liability for the

---

[8]For an exhaustive discussion of the legislative history of the Savings Clause, supporting Perry's argument that Congress intended to preserve every common law remedy against automobile manufacturers, see Keith C. Miller, *Deflating the Airbag Preemption Controversy,* 37 EMORY L.J. 897, 916-21 (1988) (discussing the "cloudless and unmistakable will of Congress not to preempt common law actions").

"defect" urged by those plaintiffs would have a regulatory effect not unlike that of any state law or regulation, *see, e.g., Taylor,* 875 F.2d at 824 n. 16, 827; *Wood,* 865 F.2d at 410-12, and, second, that that effect would create an actual conflict with the federal scheme.

We agree with their findings that state damages awards based on tort liability can have a regulatory effect. But we find that liability for the defective design *of an air bag system* would not necessarily conflict with the objectives of the Safety Act or the methods that have been chosen to fulfill those objectives. The other circuits found an actual conflict in the failure-to-install cases because the tort claims sought to impose liability on the manufacturer for choosing an option that the federal scheme expressly granted them the right to choose. Thus, the Third Circuit concluded that "Pokorny's action does present an actual conflict with the Safety Act and Standard 208 to the extent that it alleges liability for Ford's failure to include air bags or automatic seat belts" because such liability "undermines the *flexibility* that Congress and the Department of Transportation intended to give to automobile manufacturers in this area." *Pokorny,* 902 F.2d at 1123 (emphasis added). But Pokorny's claim, to the extent it asserted liability for Ford's failure to install window netting, "presents no direct, actual conflict ... [because] [i]t does not take away the *flexibility* established by the federal scheme, and it does not have the effect of prohibiting an *option* granted by Congress or the Department of Transportation." *Id.* at

1126 (emphasis added).  And the Eleventh Circuit concluded that Taylor's failure-to-install claim "would frustrate the federal regulatory scheme" because it "would, in effect remove the *element of choice* authorized in Safety Standard 208."  *Taylor,* 875 F.2d at 827 (emphasis added).

We need not decide today whether we agree with the conclusion that the other circuits reached on the failure-to-install issue. Although we have stated our agreement with much of their reasoning, we will wait to decide that issue if and when we face it.  But even if we assume that allowing liability for a manufacturer's failure to install an air bag would conflict with Congress' chosen method by removing or requiring one of the manufacturer's choices, Perry's claim presents a different scenario.[9]  Once the manufacturer chooses an option that includes an air bag system, Standard 208 S5–S6 merely set forth *minimum* performance requirements for that system.  To allow tort liability for the design of that system would not remove or require any particular choice, or otherwise frustrate "flexibility" that the federal scheme provides.  We recognize that the manufacturer who chooses to meet only the bare minimum performance requirements will be burdened with the potential for tort liability, but this is the exact burden that Congress preserved in the Savings Clause, when it stated that

---

[9]The First Circuit recognized the potential for this distinction.  After explaining the conflict that would be created by "[a]llowing a common law action holding manufacturers liable for *failing to install air bags,*" that court noted:  "We, of course, do not imply that section 1392(d)'s prohibition immunizes the manufacturer from liability for *defective design of an air bag.*"  *Wood,* 865 F.2d at 402 & n. 10 (emphases added).

"[c]ompliance with any Federal motor vehicle safety standard ... does not exempt any person from any liability under common law." Congress sought to meet its goal of minimizing the number of deaths and injuries caused by auto accidents by setting forth minimum standards and leaving common law liability in place.

MBNA contends that allowing common law liability for the defective design of an air bag system would conflict with another goal of the Safety Act, that "motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country." S.REP. No. 1301 at 12, *reprinted in* 1966 U.S.C.C.A.N. at 2720. To allow tort liability under state law, MBNA contends, would subvert this goal by allowing the development of a different standard in each State. But whether the need for uniform standards justifies the preemption of common law liability is a legislative question. Our role is to determine the intent of Congress as expressed by federal statutes and regulations. And the method that Congress chose for meeting its goal of uniformity is revealed in the Preemption Clause: *no State or political subdivision* shall establish any non-identical standards. As the Third Circuit explained in *Pokorny,*

> uniformity was not Congress's primary goal in enacting the Safety Act. In 15 U.S.C.A. § 1381, Congress declared that the Safety Act's purpose was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." Congress evidently thought that preserving common law liability would further the goal of motor vehicle safety, since § 1397(k) was included as part of the Act. In the face of this clear declaration of congressional purpose, we are unwilling to accept an overly broad notion of preemption based on uniformity that could have the effect of undercutting

Congress's concern for safety.

902 F.2d at 1122 (citations omitted).

We agree with the Third Circuit, and refuse to reject the Savings Clause in favor of Congress' secondary goal of uniformity. We thus find that Perry's state law claim for defective design of an air bag system does not create an actual conflict with the Safety Act and its underlying regulatory scheme. As a result, we cannot ignore the Savings Clause or find preemption in this case.

*5. Evidence to Support the Defective Design Claim*

MBNA contends that, even if Perry's defective design claim is not preempted, summary judgment was proper on this claim because Perry failed to adduce any competent evidence that the design of the air bag system was unreasonably dangerous. MBNA raised this argument before the district court, but that court based the summary judgment only on the preemption argument. We may affirm a district court's judgment on grounds other than those on which it was based. *See Lavespere v. Niagara Machine & Tool Works, Inc.,* 920 F.2d 259, 262 (5th Cir.1990) ("Our affirmance of the district court may rest on reasons not advanced by that court, although reversal may not be."). But we decline MBNA's invitation to do so in this case, and prefer, instead, to allow the district court to consider the issue first.

B. THE DEFECTIVE CONSTRUCTION CLAIM

Perry alleges that, even if MBNA did not defectively design its air bag systems, the particular system installed in her vehicle deviated from its design and thus was unreasonably dangerous under Louisiana law.[10]  Essentially, Perry contends that an air bag that was properly constructed to MBNA's standards would have inflated in this accident.  The district court granted summary judgment for MBNA on this claim because it found that, based on the evidence provided, a reasonable juror could not find that Perry's vehicle sustained the type of impact required to deploy the air bag under MBNA's design specifications.[11]

When reviewing a summary judgment, we consider the record *de novo* and are guided by the same standards that guided the district court.  *GATX Aircraft Corp. v. M/V Courtney Leigh,* 768 F.2d 711, 714 (5th Cir.1985).  MBNA is entitled to summary judgment if it demonstrates by pleadings, depositions, answers to interrogatories, admissions, and affidavits, that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law.  FED.R.CIV.P. 56(c).  In response to this showing by MBNA,

---

[10]Under Louisiana law,

> A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be.

*Halphen,* 484 So.2d at 114;  *see also* LA.REV.STAT.ANN. § 9:2800.55.

[11]The district court also held, and we agree, that the Safety Act does not preempt claims that are based on the allegation that a vehicle was not constructed according to its design.

Perry may not rest on mere allegations or denials, but in the same manner must demonstrate facts that show that a genuine and material issue remains for trial. FED.R.CIV.P. 56(e). Perry's evidence must be both significant and probative. *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990).

Perry bears the burden of proving the elements of her claim. *See* LA.REV.STAT.ANN. § 9:2800.54. In essence, Perry must prove both the type of impact that is necessary to deploy the air bag according to MBNA's design, and that her vehicle sustained that type of impact. Axle Stehle, MBNA's expert, testified in his deposition that MBNA designed the system so that the air bag would deploy upon an impact equal to or greater than twelve miles per hour against a rigid barrier. But because Perry's vehicle collided with an earthen embankment rather than a rigid barrier, this standard must be translated into terms that are applicable to this particular accident. Stehle testified to two separate methods for determining whether Perry's vehicle struck the ditch with the force equivalent to twelve miles per hour against a rigid barrier. First, Stehle testified that, based on his evaluation of the accident and the ditch, Perry would have had to have been traveling around forty to fifty miles per hour to trigger the air bag in this accident. Second, Stehle testified that a vehicle that sustains an impact equivalent to twelve miles per hour against a rigid barrier will suffer damage to its structural members, so we can determine whether Perry's air bag should have deployed by looking for

structural damage to the vehicle.[12]  Perry offered no evidence to supplement or contradict Stehle's testimony on this point.

If Perry's speed at impact was the only material fact, we would agree with Perry that the existence of a genuine issue prevents summary judgment.[13]  But we must also consider Stehle's testimony that an impact that is sufficient to trigger the air bag would cause structural damage to the vehicle.  While we might doubt that this would be true in every case, Perry offered no evidence to contest the validity of this standard, and thus we accept it as fact.  Perry has offered no evidence that her vehicle suffered structural damage in this accident.  In fact, the vehicle's repair records show only repairs to external parts and replacement of the

---

[12]Specifically, Stehle testified:  "I saw [vehicles that sustain an impact equivalent to twelve miles per hour against a rigid barrier], and they have damage to the structural parts of the vehicle."  Stehle Deposition at 10.  Later, Perry's attorney asked Stehle "whether it is the position of Mercedes-Benz that [structural damage] must be demonstrated before the air bag is supposed to deploy;"  to which Stehle responded:  "That is correct."  *Id.* at 12-13.  Finally, Stehle testified that, to trigger the airbag, "you have to have speed to deform some parts of the vehicle."  *Id.* at 40.

[13]The parties offered conflicting evidence on Perry's speed at impact.  Perry testified in her deposition that she was going at least twenty-five miles per hour before she noticed the stop sign, and that she then "floor boarded it" to get through the intersection and avoid Morris' car.  Her intention, she stated, was "to make the car go as fast as possible."  Thus, she argues, she must have been going well over twenty-five, and potentially between forty and fifty miles per hour, at the time of impact.  MBNA, on the other hand, submitted the affidavit of Morris, who had been trained as a deputy sheriff in accident evaluation and investigation, in which he states his belief that Perry was traveling between fifteen and twenty miles per hour, and did not accelerate, as she moved through the intersection.  Stehle testified that, based on his evaluation of photographs of the damaged vehicle, he "guessed" that Perry was traveling between ten and twenty miles per hour.

steering wheel.  And Stehle, who inspected the vehicle after it had been repaired, testified that he found no evidence that the vehicle had ever suffered structural damage.  Because Perry offered no evidence to create a factual issue of whether an impact sufficient to deploy the air bag would cause structural damage to the vehicle, or whether her vehicle sustained structural damage, we agree with the district court that MBNA is entitled to summary judgment on Perry's defective construction claim.

We REVERSE the district court's judgment and REMAND this case for further proceedings on Perry's defective design claim.