**Jennifer R. HARRIS, by and through her guardian ad litem, Lucian J. HARRIS, III, Plaintiff–Appellee,**

v.

**FORD MOTOR COMPANY, Defendant–Appellant.**

No. 94–56527.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 1996.

Submission Withdrawn Aug. 30, 1996.

Resubmitted Oct. 1, 1996.

Decided April 8, 1997.

Malcolm E. Wheeler, Parcel, Mauro, Hultin & Spaanstra, P.C., Denver, Colorado, for defendant-appellant.

Stuart B. Esner, Esner, Zakheim & Higa, Santa Monica, California, for plaintiff-appellee.

Before: O'SCANNLAIN and TROTT, Circuit Judges, VAN SICKLE,* District Judge.

O'SCANNLAIN, Circuit Judge:

We must decide whether federal law preempts a state law product liability claim against an automobile manufacturer for failure to install a driver side airbag.

**I**

On August 10, 1992, while driving a rented 1992 Mercury Topaz in New York, Jennifer Harris, a sixteen year old California citizen, lost control of the vehicle, smashed into a tree, and was seriously injured.

Harris filed a complaint against Ford Motor Company ("Ford") in California state court alleging, among other things, that the vehicle was defectively designed and that Ford was negligent because it failed "to provide a driver side airbag." The case was removed to the Central District of California where Ford moved for partial summary judgment on the ground that Harris' tort claims

---

* The Honorable Bruce M. Van Sickle, Senior United States District Judge for the District of North Dakota, sitting by designation.

under state law were pre-empted by the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), 15 U.S.C. § 1381 et seq. (1988),[1] and the regulations promulgated thereunder-specifically, by Motor Vehicle Safety Standard 208 ("Standard 208"), 49 C.F.R. § 571.208. The district court entered an order denying Ford's motion and certified its order for appeal under 28 U.S.C. § 1292(b). Ford petitioned this court for leave to file an interlocutory appeal on the pre-emption issue, which we granted.

## II

The history of the Safety Act, and of Standard 208, is extensive, and has been ably discussed by several other courts. *See Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1123–24 (3rd Cir.1990); *Taylor v. General Motors Corp.*, 875 F.2d 816, 822–23 (11th Cir.1989); *Wood v. General Motors Corp.*, 865 F.2d 395, 397–99 (1st Cir.1988). Of particular relevance to this appeal, however, is that the Act aimed "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents," 15 U.S.C. § 1381, by enabling federal regulators to promulgate uniform national motor vehicle safety standards.

Congress provided for such uniformity by expressly pre-empting State law in § 1392(d) of the Act:

Whenever a Federal motor vehicle safety standard established under this subchapter

is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

15 U.S.C. § 1392(d).

Standard 208, first promulgated in 1967 pursuant to the Safety Act, governs the passive safety restraints automobile manufacturers must install. For cars manufactured after September 1, 1989, Standard 208 gives automobile manufacturers the option of installing either an airbag or an automatic seatbelt that would signal the driver with a warning light if the belt became unhooked. 49 C.F.R. § 571.208.

In light of the history of this safety standard, it is indisputable that flexibility and choice are essential elements of the regulatory framework established in Standard 208.[2] *Pokorny*, 902 F.2d at 1124. Not only did the Secretary of Transportation carefully consider and deliberately choose to provide such flexibility, *see id.* (citing 49 Fed.Reg. 28962, 28997 (1984); 46 Fed.Reg. 53419 (1981)); *Taylor*, 875 F.2d at 823, Congress specifically prohibited the Department of Transportation from requiring airbags without congressional review, 15 U.S.C. § 1410b (1988).[3]

---

**1.** The Safety Act is now embodied in 49 U.S.C. § 30103 et seq., following Congress' minor amendments in 1994–after this case had commenced. *See* Pub.L. No. 103–272, § 1(e), 108 Stat. 943. To the extent that any amendments to the Act would alter our analysis, we believe they should not be given retroactive effect. *See Landgraf v. USI Film Products*, 511 U.S. 244, 272, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994) (presumption against retroactivity applies absent clear evidence of Congressional intent to contrary). All references to the Safety Act are to the earlier version.

**2.** Flexibility and choice are essential elements of Standard 208 as it applies to model year 1992 automobiles; Standard 208 applies different requirements to different model year cars. *See* 49 C.F.R. § 571.208 (1995).

**3.** The dissent argues that increasing safety, not national uniformity, was the sole purpose behind the Safety Act. We respectfully disagree.

First, it was the clear intent of Congress and the Secretary of Transportation that automobile manufacturers be allowed to choose between seatbelts with a warning light or airbags. The unambiguous federal policy providing such a choice would be frustrated if individual states could force manufacturers to install airbags. At least with regard to the seatbelt-airbag debate, national uniformity is essential for the integrity of the federal regulatory scheme.

Second, the dissent assumes that requiring airbags in all automobiles will increase safety, and therefore pre-emption of an airbag requirement is inconsistent with the Safety Act's purpose. This assumption is misplaced, however, because the Safety Act does not mandate higher safety standards at any cost, but only those safety standards determined by the Secretary of Transportation to be "reasonable, practicable and appropriate." 15 U.S.C. § 1392(f)(3). Pursuant to Congress' direction, the Secretary considered and rejected a safety standard requiring airbags. In doing so, the Secretary considered, *inter alia*,

Harris does not dispute that the car she was driving complied with Standard 208. Nonetheless, she claims that, under California law, she is entitled to recover against Ford for its failure to provide an airbag notwithstanding compliance with Standard 208.

## III

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Since *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), "it has been settled that state law that conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981)). Pre-emption may be "either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383 (1992).

We begin our pre-emption analysis by examining whether the Safety Act expressly pre-empts Harris' claims.[4]

### A

■ Section 1392(d) prohibits States from establishing or continuing in effect "any safety standard" not identical to the Federal standard. Harris contends that the safety standards contemplated by § 1392(d) are created by legislatures and regulators, not judges and juries. Recovery on her tort claims, she argues, would not be pursuant to a "safety standard."

Two recent Supreme Court decisions support a contrary conclusion. In *Cipollone v. Liggett Group, Inc.,* a majority of the Court rejected a similar argument regarding the Public Health Cigarette Smoking Act of 1969, concluding that judgments in state common law damage actions imposed "requirement[s] or prohibition[s]" and hence were pre-empted by that Act.[5] "[S]tate regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Cipollone,* 505 U.S. at 521, 112 S.Ct. at 2620 (plurality opinion) (quoting *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)); *id.,* 505 U.S. at 548, 112 S.Ct. at 2634 (Scalia, J., concurring in judgment in part and dissenting in part).

More recently, the Court decided *Medtronic, Inc. v. Lohr,* —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), which construed the pre-emption provisions of the Medical Device Amendments ("MDA").[6] The majority opinion expressed two presumptions about the nature of pre-emption: that Congress does not cavalierly pre-empt state law causes of action, and that the intent

the increased safety achieved by airbags as well as their cost. *See* 49 Fed. Rg. 28962, 28997 (1984). As members of the judiciary, we are not in a position to second-guess the Secretary's decision.

4. While we have never considered this question, other circuits have concluded (pre-*Cipollone*) that the Safety Act does not expressly pre-empt "no-airbag" claims, although they agree that such claims are impliedly pre-empted. *See Pokorny v. Ford Motor Co.,* 902 F.2d 1116 (3rd Cir.1990); *Taylor v. General Motors Corp.,* 875 F.2d 816 (11th Cir.1989); *Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir.1989); *Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir. 1988); *but see Perry v. Mercedes Benz of North America, Inc.,* 957 F.2d 1257 (5th Cir.1992) (no express or implied pre-emption of claim that installed airbag had design defect).

5. The relevant provision of that Act reads: "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Cipollone,* 505 U.S. at 514, 112 S.Ct. at 2617 (quoting Pub.L. 91–222, 84 Stat. 87, 15 U.S.C. § 1334(b), as amended).

6. The relevant pre-emption provision of the MDA states: "no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement ... which is different from, or in addition to, any requirement applicable under this chapter to the device...." 21 U.S.C. § 360k(a).

of Congress is the ultimate touchstone in every pre-emption case. *Id.* at ——, 116 S.Ct. at 2250. It concluded that the particular common law claims brought by the Lohrs were not pre-empted by the MDA.

Nonetheless, a majority of the Court supported the view that common law claims can impose requirements equivalent to those written by a state legislature or regulatory agency and consequently can be pre-empted when Congress speaks only about "requirements." *Id.* at —— – ——, 116 S.Ct. at 2262–63 (O'Connor, J., dissenting in part) (joined by Rehnquist, C.J., Scalia and Thomas, JJ.) (citing *Cipollone,* 505 U.S. at 521, 112 S.Ct. at 2620); *id.,* —— U.S. at ——, 116 S.Ct. at 2259 (Breyer, J., concurring) (citing *Cipollone,* 505 U.S. at 521, 112 S.Ct. at 2620). *See Papike v. Tambrands Inc.,* 107 F.3d 737, 740–42 (9th Cir.1997). As Justice Breyer observed, "[o]ne can reasonably read the word 'requirement' as including the legal requirements that grow out of the application, in particular circumstances, of a State's tort law." *Id.,* —— U.S. at ——, 116 S.Ct. at 2259 (Breyer, J., concurring).[7] *Cipollone* 's reasoning about common law damage actions thus retains its vitality after *Medtronic.*

Like the phrase "requirement or prohibition" in *Cipollone,* "any safety standard" sweeps broadly and suggests no distinction between positive enactments and common law. Unlike the narrow FDA pre-emption

regulation in *Medtronic,* § 1392(d) does not limit pre-emption to "particular state requirement[s which threaten] to interfere with a specific federal interest," *Medtronic,* —— U.S. at ——, 116 S.Ct. at 2257. Instead, § 1392(d) speaks expansively about "any safety standard applicable to the same ... item of equipment which is not identical to the Federal standard."

Moreover, *Medtronic* 's generality/specificity analysis, *see id.* at —— – ——, 116 S.Ct. at 2257–58; *Comm. of Dental Amalgam Mfrs. & Distribs. v. Stratton,* 92 F.3d 807, 813 (9th Cir.1996), informs our analysis here. Indeed, Standard 208 seems to be precisely the type of specific federal requirement the Supreme Court noted was missing in *Medtronic:*

> The generality of these [Federal medical device] requirements make this quite unlike a case in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers.

*Id.,* —— U.S. at ——, 116 S.Ct. at 2258. Furthermore, Standard 208 (which gives Ford a choice to install either automatic seatbelts or airbags) operates on the same level of specificity as Harris' state law claim (which would have required Ford to install airbags).[8]

---

**7.** Justice Breyer went on to remark that, in his view, the MDA's pre-emption provision was ambiguous and hence he turned to other considerations to conclude that the Lohr's claims were not pre-empted. Specifically, he looked to the clarity of the federal statute, the FDA regulations, and "ordinary principles of 'conflict' and 'field' pre-emption."

Such considerations support the view in this case that the Act pre-empts Harris' claims. First, Congress, the Department of Transportation, and the National Highway Transportation and Safety Administration carefully weighed the advantages and disadvantages of airbags and clearly determined that manufacturers should have a choice of passive restraints to install. Second, the federal safety standards are highly specific with regard to airbags. *See* 49 C.F.R. § 571.208. Finally, as noted in footnote 4 above, other circuits have found implied pre-emption.

**8.** We do not believe that *Medtronic* precludes express pre-emption when a state law of general

applicability (like tort law) is involved. Justice Breyer's concurrence analyzed only the specificity of the Federal requirement and suggested that "general" common law claims (*e.g.,* a state law tort action premised on the failure to use a 1–inch wire in a hearing aid) would be pre-empted by specific Federal requirements. "[I]nsofar as the MDA pre-empts a state requirement embodied in a state statute, rule, regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." *Medtronic,* —— U.S. at —— – ——, 116 S.Ct. at 2259–60 (Breyer, J., concurring). The language in the *Medtronic* plurality opinion about the need for specific state requirements must be read in light of Justice Breyer's analysis. *Papike,* 107 F.3d 737, 741–42. There is no dispute in this case that if a state statute or regulation required Ford to install airbags, it would be pre-empted by § 1392(d).

Harris' claims, if successful, would impose massive liability on Ford for its decision to install automatic seatbelts rather than air-bags. A judgment for Harris would have an effect on Ford identical to a state statute or regulation requiring airbags in all vehicles. Furthermore, "[a] rule of the common law which permits the recovery of monetary damages for its breach self-evidently sets a standard...." *Cox v. Baltimore County*, 646 F.Supp. 761 (D.Md.1986) (concluding that § 1392(d) expressly bars "no-airbag" claims). The Supreme Court has said as much in *Cipollone* and *Medtronic*. Harris is asking a judge or jury to apply what is appropriately characterized as a safety standard for performance of a vehicle or item of equipment. We conclude that § 1392(d) expressly pre-empts state law causes of action, including Harris', for failure to install airbags

## B

We must next consider whether § 1397(k) may save Harris' claim. It provides: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." § 1397(k). Harris argues that § 1397(k) logically must mean that state common law remedies against automobile manufacturers are not expressly pre-empted by the Act. The district court agreed.

We are not persuaded that § 1397(k) should be construed in isolation; rather, §§ 1392(d) and 1397(k) must be construed together. The text of § 1392(d) and its purpose in the overall structure of the Act-ensuring national uniformity in safety standards-clearly pre-empts common law claims. It is difficult to understand why Congress would use broad language in the pre-emption provision of the Act while carving out an exception to that provision for common law claims in a different part of the Act.[9]

Section 1392(d) deprives the States of "any authority either to establish, or to con-

tinue in effect, ... any safety standard...." By operation of the Supremacy Clause, any state safety standard not identical to the Federal standard is "void" and "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 747, 101 S.Ct. 2114, 2128–29, 2129, 68 L.Ed.2d 576 (1981). It is axiomatic that no liability could be imposed for the breach of a standard which is "void," "without effect," or which the state has no authority to establish or enforce.

True, § 1397(k) states that compliance with Federal standards "does not exempt any person from any liability under common law." To be "exempted" from liability, however, one must first be subject to it. And § 1392(d) removes the States' authority to subject anyone to liability for the breach of non-identical safety standards. The most reasonable and plausible reading of § 1397(k), therefore, is that compliance with Federal standards does not exempt anyone from any liability that the States have authority to impose.

This does not render § 1397(k) a nullity. Liability still exists under common law for a variety of claims dealing with automobile safety. For example, where no Federal safety standard exists, manufacturers may be liable under common law for design defects. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). Other courts have ruled that, when manufacturers choose to install an airbag pursuant to Standard 208, they may be liable for defects connected with the particular design of an airbag as well as its manufacture. *See Perry v. Mercedes Benz of North America, Inc.*, 957 F.2d 1257, 1265–66 (5th Cir.1992). In the absence of § 1397(k), manufacturers might claim that compliance with all Federal standards satisfies their common law tort duties as a matter of law, and that they should not be liable for a design or manufacturing defect even when no Federal standard

---

9. At least one court has speculated that, when the Act was passed in 1966, Congress did not foresee the use of common law actions to create safety standards for automobile manufacturers, and hence did not harmonize § 1392(d) and § 1397(k). *See Wood v. General Motors Corp.*, 865 F.2d 395, 404–406 (1st Cir.1988). *But see* *Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir.1989) (arguing that crashworthiness litigation could have been contemplated by Congress). We think this point, however resolved, is not decisive because, as we conclude below, the two provisions can be harmonized.

exists. Section 1397(k) forecloses that argument; it does not vitiate pre-emption.

## IV

Because Harris' "no airbag" claims against Ford are expressly pre-empted by the Safety Act, the order denying partial summary judgment is REVERSED and the case is REMANDED to the district court with instructions to enter summary judgment in favor of Ford on those causes of action predicated on Ford's failure to install airbags, and for further proceedings on any remaining unresolved matters.

REVERSED and REMANDED.

VAN SICKLE, District Judge, dissenting:

**Introduction**

I would affirm the District Court's denial of the defendant-appellant's motion for partial summary judgment, and hold that as a matter of law, state tort claims are not preempted by either the Safety Act or Standard 208. I disagree with the majority's assertion that a primary objective of the Safety Act was to create national uniformity in safety standards, particularly where, as here, it would conflict with the Act's undisputed purpose of improving and enhancing motor vehicle safety. My analysis of the Act's text, framework, structure and purpose lead me to conclude that it was designed to achieve improved motor vehicle safety by establishing minimum safety standards.

**Analysis of the Statement of Purpose in the Text of the Safety Act**

The text of the Safety Act reveals no intention of achieving uniformity, except as a method of establishing minimum safety standards. Congress was explicit about the purpose of the Safety Act. It was designed to promote vehicle safety by establishing federal standards, and the text reveals no other purpose.

**15 U.S.C. § 1381 Congressional Declaration of Purpose**

Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. Therefore, Congress determines that it is necessary to establish motor vehicle safety standards for motor vehicles [1] and equipment in interstate commerce; to undertake and support necessary safety research and development; and to expand the national driver register.

This section (as recodified and amended in 1994) at 49 **U.S.C. § 30101** entitled **Purpose and Policy** reads: "The purpose of this chapter is to reduce traffic accidents and deaths and injuries resulting from traffic accidents." Congress has never chosen to list uniformity as a separate purpose, even though by 1994, the issue of pre-emption of common law "no air bag" claims had been raised numerous times.

The subsidiary goals of uniformity, and flexibility for manufacturers, revealed in the legislative history, are clearly objectives only to the extent that they support the primary goal of increasing safety. The record of the legislative history supports this interpretation:

> The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards not only be strong and adequately enforced, but that they be uniform throughout the country.... Accordingly, State standards are preempted only if they differ from Federal standards applicable to the particular aspect of the vehicle or item of vehicle equipment. The States are also permitted to set more stringent requirements for their own procurement. Moreover, the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. *Compliance with such standards would thus not necessarily shield any person from product liability at common law.*

S. Rep. 89–1301, 1966 WL 4351, at 12 (emphasis added).

In addition, Standard 208 states only that: "The purpose of this standard is to reduce

---

1. In fact, 15 U.S.C. § 1391(2) states: " 'Motor vehicle safety standards' means a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." The 1994 recodification is nearly identical. 49 U.S.C. § 30102(9).

the number of deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crashworthiness requirements in terms of forces and accelerations measured on anthropomorphic dummies in test crashes, and by specifying equipment requirements for active and passive restraint systems." 49 C.F.R. § 571.208(S2) (1995). Standard 208 makes no mention of uniformity as a goal, let alone as a primary goal rivaling safety in significance, or as the only method by which safety is to be ensured. The majority cites descriptions in other circuit court decisions of the long and agonized history of Standard 208. This history is not relevant, however, in determining Congress' statutory purpose. What, for example, a particular individual administrator may have believed or said about what sort of regulation was necessary to achieve the Safety Act's objectives simply cannot serve to trump the clear language of the Safety Act itself.

National uniformity of motor vehicle safety standards is at most an ancillary goal, subordinate to the primary goal of improved motor vehicle safety. Indeed, Congress has chosen to articulate uniformity as a principal goal where it has been an important purpose behind a statute. *See e.g., CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 662, 113 S.Ct. 1732, 1736–37, 123 L.Ed.2d 387 (1993)(quoting the provision of the Federal Railway Safety Act which elaborates on national uniformity as a goal). Appellant does not seriously contest that airbags enhance safety. It is convoluted to argue that state common law which might impose liability for failure to install airbags, and thus advance the Safety Act's primary purpose, should be preempted to satisfy an implicit ancillary objective.

When deference to the Safety Act's primary objective is combined with the historically strong presumption against preemption—

particularly in areas of traditional state authority—such as tort law,[2] and with the clear broad language of the savings clause, I cannot agree that state common law claims are preempted.

**Analysis of the Savings Clause of the Safety Act**

The language of the savings clause of the Safety Act, given its plain meaning and examined in light of the Safety Act's only express goal, shows Congress intended to preserve common law claims. In the face of a contentious, litigious and longstanding debate over airbags, Congress has not seen fit to revise or 'clarify' the language of the savings clause. Yet, the majority's joint reading of the two clauses is that the express preemption clause eliminates all state law claims, and that the savings clause merely prevents an absolute defense of compliance with federal law. There is no reason to suppose that Congress intended to preserve only state law claims of, for example, defective manufacture or design in areas not regulated by the federal government, while eliminating all claims which touch on areas regulated by the Safety Act. If that was the intended result, why use such sweeping language? The savings clause refers simply to "the common law"[3] with no restriction to a subset of that law, or to particular causes of action. Further, the Supreme Court in *Medtronic, supra,* ——— U.S. at ——— ————, 116 S.Ct. at 2249–50, held that the presumption against the preemption of state police power regulations should be applied not only to determine whether Congress intended any preemption, but also to determine the scope of any express preemption. The presumption against preemption supports a narrow interpretation of even an express preemption clause and is "consistent with both federalism concerns

**2.** *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992); *Medtronic, Inc. v. Lohr,* —— U.S. ——, ——— ————, 116 S.Ct. 2240, 2249–50, 135 L.Ed.2d 700 (1996).

**3.** Black's Law Dictionary defines common law: as distinguished from statutory law created by the enactment of legislatures, the common law comprises the body of those principles and rules of action, relating to the government and

security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming, and enforcing such usages and customs ... In general it is a body of law that develops and derives through judicial decisions, as distinguished from legislative enactments.

Blacks Law Dictionary 276 (6th ed., 1990).

and the historic primacy of state regulation of matters of health and safety." *Id.*

## Conclusion

There is not a sufficient basis to assume that Congress did not understand what it was doing when it passed the Safety Act, or that it could not express itself clearly when it did so. The preservation of common law claims and the allowance for states to set higher standards in their own procurement processes were to be the twin exceptions to national uniformity. To ignore the savings clause, or to impose a convoluted reading on it, is to supplant the meaning Congress intended, with a divergent meaning this court prefers. Because I cannot agree with the majority on the primacy of uniformity, and the proper interpretation of the savings clause, I must respectfully dissent.