92 N.Y.2d 35 (1998)
699 N.E.2d 376
677 N.Y.S.2d 17
Caryn Drattel et al., Respondents,
v.
Toyota Motor Corporation et al., Appellants, et al., Defendants.
Court of Appeals of the State of New York.
Argued April 28, 1998
Decided June 16, 1998.
Lester, Schwab, Katz & Dwyer, New York City (Eric A. Portuguese, Harold Lee Schwab and Steven B. Prystowsky of counsel), for appellants.
Lipsig, Shapey, Manus & Moverman, P. C., New York City (Arthur H. Bryant, Alan M. Shapey and Brian J. Isaac of counsel), for respondents.
Mayer, Brown & Platt (Kenneth S. Geller, of the District of Columbia Bar, admitted pro hac vice, of counsel) for Product Liability Advisory Council, Inc., amicus curiae.
Coben & Associates (Larry E. Coben, of the Arizona Bar, admitted pro hac vice, of counsel) and John C. Cherundolo, New York City, for New York State Trial Lawyers Association, amicus curiae.
Chief Judge KAYE and Judges TITONE, SMITH, CIPARICK and WESLEY concur with Judge BELLACOSA; Judge LEVINE dissents and votes to reverse in a separate opinion.
*39 BELLACOSA, J.
This Court must determine whether the National Traffic and Motor Vehicle Safety Act of 1966 preempts a State common-law action. The lawsuit is against a manufacturer, based on the theory of defective design due to the absence of an air bag in a 1991 Toyota Tercel. We conclude that the plaintiffs' common-law claim was not preempted by the Congressional Safety Act under any of the propounded theories.
Supreme Court granted defendant Toyota Motor Corporation's motion for partial summary judgment. The Appellate Division reversed, denied the motion and reinstated the complaint *40 against the Toyota defendants in its entirety. The Appellate Division granted Toyota leave to appeal, certifying the standard question as to the correctness of its order. Because our answer is that the intermediate appellate court ruled correctly, we now affirm its order.

I.
Plaintiff Caryn Drattel was injured while driving her 1991 Toyota Tercel. At the time of the accident, she was wearing both a shoulder harness and a lap seat belt. Plaintiffs sued the manufacturer and distributors of the automobile (as well as the owner and driver of the other vehicle). Plaintiffs alleged defective design and failure to provide adequate safety protection, particularly because of the absence of a safer alternative design  a driver's-side air bag.
Supreme Court found that plaintiff's State claims were preempted by Federal law. The court relied principally on a Fourth Department, Appellate Division, case which found express preemption (see, Panarites v Williams, 216 AD2d 874; see also, Gardner v Honda Motor Co., 145 AD2d 41, lv dismissed 74 N.Y.2d 715). The Appellate Division, Second Department, reversed in the instant case, finding that plaintiffs' claims were not preempted (231 AD2d 326). The court concluded that based upon the language and purpose of the Safety Act, and its legislative history, Congress did not intend to preempt State common-law claims (id., at 328). Two Justices dissented; they agreed with Supreme Court and urged the view that Congress intended to preempt common-law claims (id., at 330-334).

II.
In 1966, Congress enacted the National Traffic and Motor Vehicle Safety Act (former 15 USC § 1381 et seq. [recodified in 49 USC § 30101 et seq. (1994) "without substantive change"]). Congress expressly declared that the purpose of the Safety Act was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents" (former 15 USC § 1381; see, S Rep No. 1301, 89th Cong, 2d Sess, at 12, reprinted in 1966 US Code Cong & Admin News 2709, 2720 [noting that the Act reflects "the soaring rate of death and debilitation on the Nation's highways"]). Congress determined that in order to achieve this stated goal it was "necessary to establish motor vehicle safety standards for motor vehicles and equipment in interstate commerce" (former 15 USC § 1381).
*41 Congress defined the term "safety standard" as "a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria" (former 15 USC § 1391 [2] [emphasis added]). Solely at issue in the instant case is Motor Vehicle Safety Standard 208 (49 CFR 571.208). It gives automobile manufacturers three options to comply with the minimum safety standards, the installation of air bags being just one of the alternatives.
The Safety Act includes two sections that are critical to resolving this case. First, the preemption clause states:
"Whenever a Federal motor vehicle safety standard established under this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard" (former 15 USC § 1392 [d] [emphasis added]).
Correspondingly, a savings clause exception to the already limited preemption clause is also expressly included:
"Compliance with any Federal motor vehicle safety standard issued under this title does not exempt any person from any liability under common law" (former 15 USC § 1397 [k] [emphasis added]).
Within that matrix, we now turn to the particular preemption problem in this case. Toyota, as appellant, contends that the Safety Act expressly preempts nonidentical State standards, including standards emanating out of State tort law. Alternatively, Toyota argues that plaintiffs' claim is impliedly *42 preempted by Federal law. It advances a number of theories in this regard: (1) a common-law tort standard requiring air bags would destroy the options and flexibility at the heart of the Federal statute; (2) no-airbag claims would destroy the Federal goal of uniform national standards; (3) the assertion of an express preemption clause does not bar a traditional implied preemption analysis; and (4) the general savings clause does not preserve common-law claims that conflict with Federal law.
Plaintiffs counter that the express preemption provision, savings clause and legislative history of the Safety Act preserve their claims. Additionally, plaintiffs contend that the implied preemption question should not even be reached because Congress expressly preserved the pursuit of common-law State claims. Alternatively, plaintiffs urge that their claims are not impliedly preempted, in any event, because they do not conflict with the Safety Act or accompanying regulations.

III.
The Supremacy Clause of the United States Constitution provides that Federal laws "shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (US Const, art VI, cl [2]). The United States Supreme Court has emphasized that "[c]onsideration of issues arising under the Supremacy Clause `start[s] with the assumption that the historic police powers of the States [are] not to be superseded by * * * Federal Act unless that [is] the clear and manifest purpose of Congress'" (Cipollone v Liggett Group, 505 US 504, 516, quoting Rice v Santa Fe El. Corp., 331 US 218, 230). The High Court has "oft-repeated" that "`[t]he purpose of Congress is the ultimate touchstone'" of every preemptive analysis (Medtronic, Inc. v Lohr, 518 US 470, 485, quoting Retail Clerks v Schermerhorn, 375 US 96, 103). Pointedly, this Court has also summarized the guiding principle that a "preemption question is ultimately one of congressional intent" (Guice v Schwab & Co., 89 N.Y.2d 31, 39, cert denied 520 US 1118).
Congressional preemptive intent may be discerned in three ways: (1) expressly in the language of the Federal statute; (2) implicitly, when the Federal legislation is so comprehensive in scope that it is inferable that Congress intended to fully occupy the "field" of its subject matter; or (3) implicitly, when State law actually "conflicts" with Federal law (Guice v Schwab & Co., 89 N.Y.2d 31, 39, supra). The last category may be triggered *43 when it is impossible to comply with both Federal and State laws, or when the State law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress" (City of New York v Job-Lot Pushcart, 88 N.Y.2d 163, 170, cert denied sub nom. JA-RU v City of New York, 519 US 871; see, Hines v Davidowitz, 312 US 52, 67; Barnett Bank of Marion County v Nelson, 517 US 25).

IV.
We address express preemption first. A trilogy of United States Supreme Court cases must be discussed, analyzed and harmonized to fit a proper resolution of the instant dispute into the complex universe of principles and precedents (see, Cipollone v Liggett Group, 505 US 504, supra; Freightliner Corp. v Myrick, 514 US 280; Medtronic, Inc. v Lohr, 518 US 470, supra).
Cipollone v Liggett Group (505 US 504, supra) involves the preemptive effect of the Public Health Cigarette Smoking Act of 1969 (Pub L 91-222, 84 US Stat 87, as amended, 15 USC §§ 1331-1340). Its preemption clause provided that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act" (Cipollone v Liggett Group, supra, at 515 [emphasis added]).
There, the argument against preemption of common-law actions was premised on the view that common-law damages actions do not impose "`requirement[s] or prohibition[s]' and that Congress intended only to trump `state statute[s], injunction[s], or executive pronouncement[s]'" (id., at 521). A plurality of the Supreme Court rejected this contention, stating that "[t]he phrase `[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules" (id.). It further reasoned that "`[State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy'" (id.).
Additionally, the Cipollone plurality interpreted the phrase "State law" in the Act's preemption provision to encompass common-law claims (id., at 522). Distinguishably, it stated that "[a]lthough the presumption against pre-emption might give *44 good reason to construe the phrase `state law' in a pre-emption provision more narrowly than an identical phrase in another context, in this case such a construction is not appropriate" (id., at 522). The reasoning was that an earlier version of the Act was more precise and narrow on its face, and that, therefore, the broader language of the subsequent Act at issue extended that section's preemptive reach (id., at 522-523).
Cipollone is distinguishable because it was particularly suited to the specific statute at issue there. A key additional feature is that the Cipollone statute did not contain a savings clause. In fact, the plurality emphasized that it "`must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning'" (id., at 521 [emphasis added], quoting Shaw v Delta Air Lines, 463 US 85, 97). It then concluded that there was "no `good reason to believe' that Congress meant less than what it said" (id., at 522).
Next in the procession of United States Supreme Court preemption cases is Freightliner Corp. v Myrick (514 US 280, supra). There, the Supreme Court found against express or implied preemption with regard to the same Federal Safety Act at issue here. The plaintiffs alleged that the absence of an antilock braking system in tractor-trailers manufactured by the defendants constituted a negligent design defect (id., at 283). Notably, however, because the Federal antilock braking system standard at issue there had been suspended, that case is of limited dispositional guidance for present purposes (id., at 285). The Court stated that the Act's preemption clause applies only when a Federal motor vehicle safety standard is "`in effect'" (id., at 286, quoting former 15 USC § 1392 [d]). Therefore, as there was "no minimum, objective standard at all," the Court resolved that the States were not precluded from continuing and applying their own safety standards (id.).
The third Supreme Court preemption pronouncement came in Medtronic, Inc. v Lohr (518 US 470, supra). The Court found that the Medical Device Amendments Act of 1976 did not preempt a State common-law negligence action against the manufacturer of an allegedly defective device (id., at 474, 503). It held that the preemption clause at issue there did not preclude the plaintiff, injured when her pacemaker failed, from invoking Florida common law (id.). The preemption clause provided that "no State * * * may establish * * * any requirement (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which *45 relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter" (id., at 486 [emphasis added]).
A plurality of the Supreme Court rejected the defendant's argument that the word "requirement" includes common-law claims, characterizing the contention as "unpersuasive" and "implausible" (id., at 487). It stated that "if Congress intended to preclude all common-law causes of action, it chose a singularly odd word [i.e., `requirement'] with which to do it" (id. [emphasis added]). The plurality declared that "[t]he statute would have achieved an identical result, for instance, if it had precluded any `remedy' under state law relating to medical devices" (id.). It also explained that "`[r]equirement' appears to presume that the State is imposing a specific duty upon the manufacturer, and although [in Cipollone we] concluded that a statute pre-empting certain state `requirements' could also pre-empt common-law damages claims * * * that statute did not sweep nearly as broadly as [the statute in Medtronic]" (id., at 487-488).
This cogent analysis supports the unanimous conclusion of this Court that no express preemption exists in this case. Informed by the evolution of the guiding principles and precedents, and persuaded most significantly by the savings clause in the Safety Act, we conclude that Congress did not expressly preempt State common-law claims. Notably, the trumping effect of the instant savings clause for resolving express preemption questions was entirely absent from the statutes and relevant analyses in both Medtronic and Cipollone. Additionally, although the Supreme Court Justices have varied widely in their individual expressions in these various cases, we discern no utility in reassembling their positions in an effort to predict some future outcome of the instant dispute.
Our conclusion that the Safety Act does not expressly preempt common-law claims is also in accord with the predominant holdings of the Federal Circuit Courts that have considered the question (see, Pokorny v Ford Motor Co., 902 F.2d 1116, 1121 [3d Cir], cert denied 498 US 853; Taylor v General Motors Corp., 875 F.2d 816, 825 [11th Cir], cert denied 494 US 1065; Kitts v General Motors Corp., 875 F.2d 787, 789 [10th Cir], cert denied 494 US 1065; Wood v General Motors Corp., 865 F.2d 395, 402 [1st Cir], cert denied 494 US 1065; see also, Irving v Mazda Motor Corp., 136 F.3d 764 [11th Cir]; Myrick v Freuhauf Corp., 13 F.3d 1516 [11th Cir], affd on other grounds sub nom. Freightliner Corp. v Myrick, 514 US 280; Buzzard v Roadrunner Trucking, 966 F.2d 777, 781 [3d Cir]; *46 but see, Harris v Ford Motor Co., 110 F.3d 1410, 1415 [9th Cir]).
Additionally, the majority of the highest courts of our sibling States have also determined that the Act does not expressly preempt State damage claims based upon a manufacturer's failure to install air bags (see, Cellucci v General Motors Corp., 550 Pa 407, 413-414, 706 A2d 806, 809 [1998]; Minton v Honda of Am. Mfg., 80 Ohio St 3d 62, 70-71, 684 NE2d 648, 655 [1997]; Munroe v Galati, 189 Ariz 113, 116-117, 938 P2d 1114, 1117-1118 [1997]; Wilson v Pleasant, 660 NE2d 327, 330 [Ind 1995]; Tebbetts v Ford Motor Co., 140 NH 203, 206-207, 665 A2d 345, 347 [1995], cert denied 516 US 1072; but see, Zimmerman v Volkswagen of Am., 128 Idaho 851, 856-857, 920 P2d 67, 72 [1996], cert denied 520 US 1115).
Noteworthily, the trilogy of Supreme Court cases and the mass of other cases in this preemption area have spawned significant and useful commentary (see, Grey, Make Congress Speak Clearly: Federal Preemption of State Tort Remedies, 77 BU L Rev 559, 565 [1997] [reviewing Cipollone and Medtronic, and arguing that when "statutory ambiguity exists, courts should be extremely wary of finding congressional intent to preempt"]; Leflar and Adler, The Preemption Pentad: Federal Preemption of Products Liability Claims after Medtronic, 64 Tenn L Rev 691 [1997]; Warren, Compliance with Governmental Regulatory Standards: Is It Enough to Immunize a Defendant from Tort Liability?, 49 Baylor L Rev 763 [1997]; Klein, Toward a Workable Paradigm of Federal Preemption, SC33 ALI-ABA 101 [1998]).
We confidently join this plethora of persuasive authority on the side of no express preemption. First and foremost, the particular preemption provision does not specifically mention common-law liability and the presumption against preemption must also be given weight. Courts finding no express preemption agree that the absence of any explicit reference to common-law actions in the preemption clause leads to a no-express preemption conclusion (see, Minton v Honda of Am. Mfg., supra, 80 Ohio St 3d, at 70-72, 684 NE2d, at 655-656). As noted in Medtronic, if Congress had intended the preemption clause to preclude State tort claims, it could have easily achieved that result. Indeed, Federal courts have aptly noted that Congress has explicitly referred to common-law actions in the preemption clauses of other statutes when it has sought to foreclose that route to recompense (Taylor v General Motors Corp., 875 F.2d 816, 824, supra, citing Domestic Housing and International *47 Recovery and Financial Stability Act, 12 USC § 1715z-17 [d]; § 1715z-18 [e] [1987]; Copyright Act of 1976, 17 USC § 301 [a] [1982]; Employment Retirement Income Security Act of 1974, 29 USC § 1144 [a], [c] [1] [1982]; see, Pokorny v Ford Motor Co., 902 F.2d 1116, 1121, supra). We thus simply see no justifiable basis to conclude, as the dissent does, that Congress intended the term "standards" to be "synonymous" with common-law claims (see, dissenting opn, at 57, 58).
Moreover, the savings clause of the Safety Act potently and pointedly negates any lingering notion of express preemption of State common-law claims. That clause, which must be read in tandem with the general preemption language in the Act, sweepingly yet particularly authorizes the prosecution of "any" common-law claims, including those relating to specific safety standards (Taylor v General Motors Corp., supra, 875 F2d, at 824; see, Pokorny v Ford Motor Co., supra, 902 F2d, at 1121). We disagree with the dissent's characterization of the savings clause as "highly ambiguous" (see, dissenting opn, at 58). It is hard to imagine how Congress could have been plainer in its intended meaning in this regard and it takes tortured syntax and law to propose a newly fashioned version of what it actually said.
Courts have properly rejected pleas to narrowly interpret the savings clause as preserving common-law liability only for those automobile safety defects that are not specifically addressed by a safety standard (see, Taylor v General Motors Corp., supra, 875 F2d, at 824). It strains reason and common sense to suggest that Congress used sweeping language to create a constricted universe. That would not make good law or justifiable judicial analysis. Additionally, the narrow construction urged "would render the savings clause a mere redundancy since the preemption clause itself provides that where a federal standard does not govern `the same aspect of performance' as the state standard, the state standard is not preempted" (id.). Proper statutory construction rubrics do not allow for such hollowness.
Lastly, in this regard, we find that the legislative history of the Act confirms that the savings clause was intended by Congress to preserve State law remedies in circumstances involving defectively manufactured automobiles (see, Minton v Honda of Am. Mfg., 80 Ohio St 3d, at 71-73, 684 NE2d 648, 656-657, supra). Specifically, the Senate Report states that "the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance *48 with such standards would thus not necessarily shield any person from product liability at common law" (S Rep No. 1301, 89th Cong, 2d Sess, at 12, reprinted in 1966 US Code Cong & Admin News 2709, 2720 [emphasis added]). The House Committee Report is correspondingly supportive, declaring that Congress "intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and tort liability" (HR Rep No. 1776, 89th Cong, 2d Sess, at 24 [1966] [emphasis added]).

V.
We must next determine whether Congress intended any implied preemption of State common-law actions. This preemption category has generated significant controversy and division among the courts that have reviewed the Safety Act in this respect.
Cipollone addressed the implied preemption prong and, more specifically, its availability in light of a statutorily expressed preemption provision. A majority of the High Court stated as follows:
"When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a `reliable indicium of congressional intent with respect to state authority,' `there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation. Such reasoning is a variant of the familiar principle of expressio unius est exclusio alterius: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted" (Cipollone v Liggett Group, 505 US 504, 517, supra [citations omitted] [emphasis added]).
Notably, Freightliner Corp. v Myrick (514 US 280, supra) seemed to qualify and restrict this dictum. Interpreting Cipollone, the Myrick Court concluded that "[t]he fact that an express definition of the pre-emptive reach of a statute `implies'  i.e., supports a reasonable inference  that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied *49 preemption" (id., at 288 [emphasis added]). The Court stated that "[a]t best, Cipollone supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule" (id., at 289 [emphasis added]).
Myrick did not overrule Cipollone; rather, it clarified decisions that interpreted Cipollone to mean that implied preemption can never exist when Congress has expressly preempted a field. In any event, the two cases read together do not favor, support or mandate an implied preemption analysis of common-law claims in the present case framework. Although after Myrick an express preemption clause will not "entirely foreclose[] any possibility of implied pre-emption" (Freightliner Corp. v Myrick, supra, 514 US, at 288), Myrick still favors an inference that in applicable situations an express preemption clause may foreclose a claim of comprehensive implied preemption (see, Munroe v Galati, 189 Ariz 113, 117-118, 938 P2d 1114, 1118 [1997], supra). The dissent's rejection of the proposition that an "express preemption clause in a Federal statute may render it unnecessary for a court to undertake [an] implied conflict preemption analysis" flatly ignores the direct language of the Cipollone and Myrick majority opinions (see, dissenting opn, at 60 [emphasis added]).
Therefore, the instant case provides a comfortable fit to Myrick in this regard. Here, the Safety Act's express preemption clause combined with the savings clause and over-all legislative history provide far more than a "`reliable indicium of congressional intent'" to preserve common-law causes of action such as the plaintiffs' action (Cipollone v Liggett Group, 505 US 504, 517, supra, quoting Malone v White Motor Corp., 435 US 497, 505).
We are unpersuaded by the view that the Safety Act does not provide a "reliable indicium of congressional intent" because Congress never anticipated the situation that now confronts us  litigation of common-law claims (see, Wood v General Motors Corp., 865 F.2d 395, 402, supra). This theory is groundless in the face of the savings clause alone. Additionally, "design defect litigation, although then a relatively recent phenomenon, was not so new as to catch the Congress unawares" (id., at 421 [Seyla, J., dissenting]).
While we conclude that an implied preemption analysis is not warranted here, we nonetheless, out of a desire for comprehensive thoroughness, fully address the arguments and are satisfied that plaintiffs' claims are not impliedly preempted.

*50 VI.
Interpreting and applying the relevant Supreme Court decisions, various highest courts of the States have comfortably taken the no-implied preemption route with regard to the Safety Act (see, Minton v Honda of Am. Mfg., 80 Ohio St 3d 62, 74-75, 684 NE2d 648, 658 [1997], supra; Munroe v Galati, 189 Ariz 113, 119, 938 P2d 1114, 1120 [1997], supra; Wilson v Pleasant, 660 NE2d 327, 335-339 [Ind 1995], supra; Tebbetts v Ford Motor Co., 140 NH 203, 207-208, 665 A2d 345, 348 [1995], supra).
On the other hand, a few have ruled in favor of implied preemption (see, Cellucci v General Motors Corp., 550 Pa 407, 417-420, 706 A2d 806, 811-812 [1998], supra; Cooper v General Motors Corp., 702 So 2d 428, 434 [Miss 1997]). Several Circuit Courts have also added their weight to the implied preemption school in this context (see, Pokorny v Ford Motor Co., 902 F.2d 1116, 1121-1122, 1126 [3d Cir], supra; Taylor v General Motors Corp., 875 F.2d 816, 825 [11th Cir], supra; Kitts v General Motors Corp., 875 F.2d 787, 789 [10th Cir], supra; Wood v General Motors Corp., 865 F.2d 395, 402 [1st Cir], supra). Notably, however, the substantial majority of these Federal no-implied-preemption rulings were made prior to Cipollone and Myrick (but see, Montag v Honda Motor Co., 75 F.3d 1414 [10th Cir 1996], cert denied sub nom. Montag v American Honda Motor Co., 519 US 814; Irving v Mazda Motor Corp., 136 F.3d 764 [11th Cir 1998], supra [both decided after Cipollone and Myrick]).
Utilizing the mass of precedents as best and selectively as we can, we turn to the particular implied preemption arguments made in this case. Initially, we conclude that no implied "field" preemption is supportable because the Safety Act does not purport to occupy the field exclusively and comprehensively with respect to the pertinent claims. Indeed, the savings clause dramatically demonstrates the opposite  that Congress did not intend to occupy the entire field of automotive safety. This appears to be the unanimous view of both State and Federal courts.
The implied "conflict" preemption prong presents a bit of a different problem and has generated some varying views among the courts. Myrick stated that implied "conflict" preemption exists "where it is `impossible for a private party to comply with both state and federal requirements * * *' or where state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (Freightliner Corp. v Myrick, 514 US 280, 287, supra, *51 quoting English v General Elec. Co., 496 US 72, 79, and Hines v Davidowitz, 312 US 52, 67, supra; see, City of New York v Job-Lot Pushcart, 88 N.Y.2d 163, 170, supra). That expression well serves as our guidepost in this respect.
First, we do not believe that it is "`impossible for [Toyota] to comply with both state and federal requirements'" (Freightliner Corp. v Myrick, supra, 514 US, at 287, quoting English v General Elec. Co., 496 US 72, 79, supra). While certain circumstances may occur in which a common-law judgment could be preempted due to a conflict with Federal law, we are satisfied that the present situation does not rise to that level (compare, Minton v Honda of Am. Mfg., 80 Ohio St 3d 62, 77, 684 NE2d 648, 659, supra ["Honda's arguments of implied conflict preemption rest on the same faulty premise as its express-preemption argument, namely, that appellant's claim somehow amounts to a state regulatory mechanism."]).
To warrant implied "conflict" preemption a true conflict must necessarily be evident (see, Wilson v Pleasant, 660 NE2d 327, 337 [Ind 1995], supra). Neither the Safety Act nor Standard 208 prevented Toyota from including air bags in its 1991 Tercels. Toyota could have installed an air bag even though it was not required to do so by Federal law. Consequently, this injured plaintiff should not be deprived of the opportunity to establish in an appropriate court of law under higher State standards (something expressly reserved and contemplated in the Safety Act itself) that Toyota should have included a driver's-side air bag because, for instance, it possessed the technology and because it was aware that the inclusion of an air bag would have been a better alternative safety device given the specific design of the car. This avenue would not produce or deviate from a universal, national standard; rather, it would constitute a surviving opportunity for resolution of a specifically contemplated factual scenario. The effect of a finding of liability would be to compensate the plaintiff for injuries proven ultimately to have been caused by a manufacturer's knowing choice not to do something stricter under State law which, in fact, was specifically made optional under Federal law (see, Minton v Honda of Am. Mfg., supra, 80 Ohio St 3d, at 77-78, 648 NE2d, at 659-660).
Additionally, State law does not "`stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (Freightliner Corp. v Myrick, 514 US 280, 287, supra, quoting Hines v Davidowitz, 312 US 52, 67, supra). *52 We reject the argument that "conflict" preemption is established because Congress's general goal in enacting the Safety Act was to ensure uniformity of automotive safety regulations (compare, Harris v Ford Motor Co., 110 F.3d 1410, 1412 [9th Cir], supra; Cellucci v General Motors Corp., 550 Pa 407, 415-416, 706 A2d 806, 810 [1998], supra). Courts have soundly rejected the position that uniformity by itself is an overriding purpose of the Safety Act, and thus justifies the preclusive effects associated with implied conflict preemption (Minton v Honda of Am. Mfg., supra, 80 Ohio St 3d, at 77-78, 648 NE2d, at 660 [1997]; Munroe v Galati, 189 Ariz 113, 117-118, 938 P2d 1114, 1118-1119 [1997], supra; Pokorny v Ford Motor Co., 902 F.2d 1116, 1122-1123, supra; compare, Harris v Ford Motor Co., supra, 110 F3d, at 1416-1417 [Van Sickle, J., dissenting]).
The expressly declared purpose of the Safety Act was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents" (former 15 USC § 1381). While uniformity may have been a subsidiary goal for this enactment, it was not the primary overriding goal that would carry the forbidding consequences of implied conflict preemption (see, Pokorny v Ford Motor Co., supra, 902 F2d, at 1122 ["uniformity was not Congress's primary goal in enacting the Safety Act * * * we are unwilling to accept an overly broad notion of preemption based on uniformity that could have the effect of undercutting Congress's concern for safety"]; Harris v Ford Motor Co., supra, 110 F3d, at 1417 [Van Sickle, J., dissenting] ["(n)ational uniformity of motor vehicle safety standards is at most an ancillary goal, subordinate to the primary goal of improved motor vehicle safety"]). The uniformity argument is plainly insufficient in this case to supply the implied "conflict" preemption "kicker," necessary to override the other express and controlling language of the Safety Act's preemption and savings clauses, and the legislative history. We would go so far as to assert that an implied "conflict" preemption finding here might undermine the purpose and policies underlying the Safety Act and might contradict its express provisions (see, Wilson v Pleasant, 660 NE2d 327, 337 [Ind], supra).
Contrary to the dissent's characterization of the majority's rationale, we nowhere say or imply that the savings clause generally overcomes implied conflict preemption (see, dissenting opn, at 67). Rather, we carefully conclude that the implied conflict preemption theory is not available in the instant case. Our reason is that recognition of plaintiffs' State common-law claims here would neither render compliance with Federal law *53 "impossible" (i.e., there is no "actual conflict"), nor prevent the "accomplishment and execution" of Congress's objective in enacting the Safety Act  "to reduce traffic accidents and death and injuries to persons resulting from traffic accidents" (Freightliner Corp. v Myrick, 514 US 280, 287, supra; former 15 USC § 1381). Thus, we reject the dissent's suggestion that we are saying that the savings clause "allow[s] survival of a State tort claim actually in conflict with a Federal statutory or regulatory scheme" (see, dissenting opn, at 65). To the contrary, we find no actual conflict in the present case.
In sum, the 1966 Safety Act does not preclude the plaintiffs' common-law claims. Congress amended Safety Standard 208 in 1984 to require passive restraints, but did not otherwise amend the Safety Act. Until Congress speaks more definitively and differently, we are satisfied that its express language in the Act itself provides sufficient guidance against preemptive features in these circumstances. To echo one Circuit Court of Appeals, "[a]bsent guidance, we have done as best we can with these difficult problems of preemption in a changing legal climate" (Wilson v Bradlees of New England, 96 F.3d 552, 559 [1st Cir], cert denied sub nom. Union Underwear Co. v Wilson, 519 US 1149). Frankly, we, too, "should be especially reluctant to insulate administrative decisions from the prophylaxis of the civil jury, thereby placing common law protections beyond the reach of the motoring public" (Wood v General Motors Corp., 865 F.2d 395, 419 [1st Cir] [Seyla, J., dissenting], supra).
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
LEVINE, J. (dissenting).
I respectfully dissent. In my view, plaintiffs' causes of action against the Toyota defendants for injuries sustained by plaintiff Caryn Drattel, to the extent that they are based upon the failure to manufacture and market the accident vehicle with an airbag installed for occupant crash protection, are superseded under the doctrine of implied conflict preemption by the provisions of the National Traffic and Motor Vehicle Safety Act of 1966 (former 15 USC § 1381 et seq., recodified "without substantive change" in 49 USC § 30101 et seq.) (hereinafter the MV Safety Act), and by the pertinent implementing regulation, Federal Motor Vehicle Safety Standard 208 (49 CFR 571.208) (hereinafter Federal Safety Standard 208).
*54 The MV Safety Act directs the Department of Transportation and its subordinate agency, the National Highway Traffic Safety Administration (NHTSA) to promulgate Federal motor vehicle safety standards that are "practicable" (former 15 USC § 1391 [2]). The legislative history of the MV Safety Act makes clear that the direction to formulate "practicable" standards was intended to require the regulatory agency to give "consideration [to] all relevant factors, including technological ability to achieve the goal of a particular standard as well as consideration of economic factors" (HR Rep No. 1776, 89th Cong, 2d Sess, at 16 [1966]). Similarly, Congress intended that "reasonableness of cost, feasibility and adequate lead time should be included among those factors which the Secretary should consider in making his total judgment [as to safety standards]" (S Rep No. 1301, 89th Cong, 2d Sess, at 6, reprinted in 1966 US Code Cong & Admin News 2709, 2714).
The legislative history in both Chambers of Congress also reflects Congressional intent that motor vehicle safety standards, regulating one of our largest and most vital industries, be uniform:
"The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country" (id., at 2720 [emphasis supplied]; see also, HR Rep No. 1776, op. cit., at 17).
In order to achieve the goal of uniformity in safety standards, Congress enacted a comprehensively worded preemption clause entitled, "Supremacy of Federal standards; allowable higher standards for vehicles used by Federal or state governments," which provided:
"Whenever a Federal motor vehicle safety standard established under this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard" (former 15 USC § 1392 [d] [emphasis supplied]).
The literal language of the preemption clause broadly invalidates any State "standard" regarding the "same aspect of *55 performance" or "item of equipment," deviating from the applicable Federal standard. Only an "identical standard" is permitted. Some State high courts have, however, relied on the statutory inclusion of the phrase "minimum standard of performance" in the definition of "safety standard" both to demonstrate a more limited construction of the preemption clause and to negate Congressional intent to achieve uniformity through it (see, Munroe v Galati, 189 Ariz 113, 117-119, 938 P2d 1114, 1118-1119). I believe this misreads the pertinent statutory provisions. The MV Safety Act's preemption clause expressly provides for only one permissible State deviation from the Federal standards through imposition of higher standards of performance  when a State requires superior performance under its own vehicle procurement policies:
"Nothing in this section shall be construed to prevent the * * * government of any State * * * from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard" (former 15 USC § 1392 [d] [emphasis supplied]).
It is, thus, readily apparent that Federal safety standards are "minimum" standards only in the sense that they present a floor (and not a ceiling) of product safety performance for automobile manufacturers, but are in fact both a ceiling and a floor as to a State's power to impose safety standards for vehicles sold to the general public regarding the same aspect of performance or vehicle equipment covered by any Federal safety standard. Any other construction of "minimum standard," either to narrow the meaning of the preemption clause, or to negate Congressional intent to impose uniform safety standards, would render the single, State vehicle procurement exception unnecessary and redundant.

I.

Express Preemption
The broad language and legislative history of the MV Safety Act of 1966 would undoubtedly have required express preemption if New York had enacted, during the pertinent period here, legislation mandating the installation of airbags as part of any occupant crash protection system in all vehicles marketed in *56 the State, and in connection therewith created a statutory cause of action against manufacturers for injuries incurred as a result of noncompliance with the mandate. Federal Safety Standard 208, then in effect, required manufacturers to equip all motor vehicles with an occupant crash protection system, but permitted a choice among three systems, airbags, passive belt restraints or manual belt restraints. Thus, a mandatory airbag restraint statute would "not [have been] identical to the Federal standard," which was "applicable to the same aspect of performance of such vehicle or item of equipment" (former 15 USC § 1392 [d]). In the plethora of airbag preemption cases nationwide, no appellate court  Federal or State  has suggested that a State mandatory airbag statute or regulation would have passed muster under the Supremacy Clause (US Const, art VI, cl [2]).
Focusing solely on the preemption clause of the MV Safety Act, and ignoring, for the moment, the Act's "savings clause" (see, former 15 USC § 1392 [d]), I also believe a close reading of the multiple opinions in the more recent United States Supreme Court preemption cases shows that a consistent majority of the Justices would construe the preemption language of section 1392 (d) to preclude the imposition of State common-law tort liability based solely upon the manufacturer's failure to have installed an airbag on plaintiffs' 1991 Toyota. The preemption clause employs the term "standard" regarding safety features of a motor vehicle, which a State is prohibited from imposing unless identical to the analogous Federal safety standard.
"Standard," regarding matters affecting the safety of others, is peculiarly a term of art in the common law of torts. Thus, in its introductory discussion of negligence, a leading treatise in the law of torts identifies the elements of a negligence cause of action as first a "duty * * * requiring the person to conform to a certain standard of conduct" and second, a "failure on the person's part to conform to the standard required" (Prosser and Keeton, Torts § 30, at 164 [5th ed] [emphasis supplied]). Black's Law Dictionary includes within the common meaning of "standard": "a measure or rule applicable in legal cases such as the `standard of care' in tort actions" (Black's Law Dictionary 1404 [6th ed 1990] [emphasis supplied]).
In CSX Transp. v Easterwood (507 US 658), the Supreme Court held that a preemption clause in the Federal Railroad Safety Act (45 USC §§ 421-444) invalidating any State "law, rule, regulation, order, or standard relating to railroad safety" *57 (45 USC § 434 [emphasis supplied]), once a Federal regulation was issued covering the same subject matter, preempted a common-law tort claim based upon excessive speed of a train at a grade crossing, in view of regulations fixing a maximum speed at such a crossing (CSX Transp. v Easterwood, supra, at 662, n 2). In Cipollone v Liggett Group (505 US 504), as the majority notes (see, majority opn, at 43), common-law damage actions were deemed preempted by a clause banning any "[pertinent] requirement or prohibition * * * imposed under State law" (Cipollone v Liggett Group, supra, at 521-522). The Cipollone plurality rejected any distinction for preemption purposes between positive law enactments by a State statute or regulation and the imposition of State common-law tort liability:
"As we noted in another context, `[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.' San Diego Building Trades Council v. Garmon, 359 U. S. 236, 247" (Cipollone v Liggett Group, 505 US, at 521, supra).
In the most recent of the Supreme Court's preemption cases dealing with State common-law liability, Medtronic, Inc. v Lohr (518 US 470), the preemption clause of the Medical Device Amendments of 1976 to the Federal Food, Drug and Cosmetic Act of 1938 (21 USC § 360k [a]) decreed that "[n]o State * * * may establish * * * with respect to a [medical] device * * * any requirement * * * which is different from, or in addition to, any [Federal] requirement" (emphasis supplied). Justice O'Connor, dissenting with the concurrence of the Chief Justice, Justices Scalia and Thomas, held that the plaintiffs' common-law tort action based upon an allegedly defective pacemaker should be dismissed on the ground of complete express preemption (Medtronic, Inc. v Lohr, 518 US, at 509-510, supra). Justice Breyer, concurring separately with the four-Justice plurality opinion against express preemption, agreed with Justice O'Connor that the preemption clause would invalidate State common-law tort claims if the State tort "standards" were actually "`different from, or in addition to,' federal standards" (id., at 504 [emphasis supplied]). Justice Breyer, however, deferred to the Federal regulatory agency's determination that the "different" or "in addition" conditions for preemption had not been met (id., at 506-507).
*58 It thus appears quite evident that a firm majority of at least five Justices of the Supreme Court, as reflected in Cipollone, CSX, and Medtronic, regard State "standards" (CSX Transp. v Easterwood, supra; Medtronic, Inc. v Lohr, supra [Breyer, J.]), "requirement or prohibition" (Cipollone v Liggett Group, supra) and "requirements" (Medtronic, Inc. v Lohr, supra) in preemption clauses as essentially synonymous in reflecting a Congressional preemptive intent to supersede overlapping or conflicting State common-law standards of care applied to impose liability in tort actions such as plaintiffs' here. It is particularly noteworthy that in none of the foregoing cases did the preemption clause contain any specific reference to common-law standards or requirements. Thus, the absence of any express reference to common-law standards in the preemptive language of former section 1392 (d) cannot be a significant factor in discerning the intent of Congress as to preemption of common-law standards of care here.
Nonetheless, I am otherwise constrained to reject express preemption of plaintiffs' design defect claims for failure to install airbags, under Supreme Court precedent, because of the MV Safety Act's "savings clause." The Supreme Court has applied a presumption against express preemption when the claimed preemptive matters involve "historic police powers of the States" and requires that the intent of Congress to expressly preempt under such circumstances must be "clear and manifest" (Rice v Santa Fe El. Corp., 331 US 218, 230; see, Cipollone v Liggett Group, supra, 505 US, at 518, 523). State common-law remedies for tortious acts can well be considered part of the historic police powers of the States (see, Cipollone v Liggett Group, supra; see also, Taylor v General Motors Corp., 875 F.2d 816, 823, cert denied 494 US 1065).
The applicable savings clause in this appeal provides:
"Compliance with any Federal motor vehicle safety standard issued under this title does not exempt any person from any liability under common law" (former 15 USC § 1397 [k]).
I find the savings clause highly ambiguous, and my conclusion is only buttressed by the various judicial interpretations given it. At one extreme, it has been construed as only preserving common-law suits involving claimed product defects not covered by any of the Federal safety standards (see, Harris v Ford Motor Co., 110 F.3d 1410). At the other extreme, the majority and the high courts of some sister States read the provision *59 as negating even implied preemption of common-law actions (see, Munroe v Galati, 189 Ariz 113, 938 P2d 1114, supra; Tebbetts v Ford Motor Co., 140 NH 203, 665 A2d 345, cert denied 516 US 1072). Most appellate courts, State and Federal, however, have adopted an intermediate interpretation of the savings clause as negating preemption of common-law product liability tort claims except for those in which implied conflict preemption would apply (see, Pokorny v Ford Motor Co., 902 F.2d 1116 [3d Cir], cert denied 498 US 853; Taylor v General Motors Corp., 875 F.2d 816 [11th Cir], cert denied 494 US 1065, supra; Zimmerman v Volkswagen of Am., 128 Idaho 851, 920 P2d 67, cert denied 520 US 1115).
In light of the principles previously discussed, applying a presumption against express preemption, and requiring that express preemption provisions be narrowly construed, I have concluded that the ambiguities of the savings clause insofar as it limits preemption by expressly preserving at least some common-law claims, prevent any express preemption of plaintiffs' no-airbag liability theory.

II.

Implied Conflict Preemption
In addition to express preemption, implied conflict preemption may be found when it is impossible for one to act in compliance with both the Federal and State laws, or when the State law "stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (Hines v Davidowitz, 312 US 52, 67 [emphasis supplied]; Guice v Schwab & Co., 89 N.Y.2d 31, 39, cert denied 520 US 1118; City of New York v Job-Lot Pushcart, 88 N.Y.2d 163, 170, cert denied sub nom. JA-RU v City of New York, 519 US 871). Implied conflict preemption can supersede State common-law tort, contract and agency claims (see, International Paper Co. v Ouellette, 479 US 481; Chicago & N. W. Transp. Co. v Kalo Brick & Tile Co., 450 US 311; Guice v Schwab & Co., supra).
Moreover, State common-law claims may be preempted by Federal regulations promulgated pursuant to Congressional delegation of discretionary quasi-legislative authority (Fidelity Fed. Sav. & Loan Assn. v de La Cuesta, 458 US 141, 153-154).
Contrary to the suggestion of the majority (see, majority opn, at 49), Cipollone v Liggett Group (supra) and Freightliner Corp. v Myrick (514 US 280), read together, do not stand for the *60 proposition that the inclusion of a limited express preemption clause in a Federal statute may render it unnecessary for a court to undertake implied conflict preemption analysis. Freightliner expressly states that "[o]ur subsequent decisions have not read Cipollone to obviate the need for analysis of an individual statute's pre-emptive effects" (514 US, at 289, supra [emphasis supplied] [citing to implied conflict preemption discussion in CSX Transp. v Easterwood, supra, 507 US, at 673, n 12]). Moreover, even when the plurality opinion in Medtronic rejected express preemption, it acknowledged a remaining "overarching concern" to apply preemption "where a particular state requirement threatens to interfere with a specific federal interest" (Medtronic, Inc. v Lohr, 518 US, at 500, supra [emphasis supplied]), and further recognized the possibility that a future medical device tort claim might "also be pre-empted under conflict pre-emption analysis" (id., at 503 [emphasis supplied]).
Also, contrary to the position of the majority (see, majority opn, at 52), implied conflict preemption is not avoided here merely because Federal automobile safety standards and State tort liability both promote the goal of enhanced traffic safety. "In determining whether Vermont nuisance law `stands as an obstacle' to the full implementation of the CWA, it is not enough to say that the ultimate goal of both federal and state law is to eliminate water pollution. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal" (International Paper Co. v Ouellette, supra, 479 US, at 494 [emphasis supplied]).
As I previously pointed out, Congress in the MV Safety Act of 1966 directed the Secretary of Transportation to adopt Federal safety standards of performance that were to be "practicable," and the legislative history unmistakably shows that Congress wanted the regulatory authority to consider the need for uniform standards and a balancing of safety and economic factors to achieve reasonable and practical automotive safety performance requirements.
The Department of Transportation and the NHTSA, to whom the task was delegated, followed the Congressional mandate, especially with respect to standards for occupant crash protection systems. Based upon a weighing of such factors as added safety benefit, technological feasibility, additional costs of installation and likely consumer reaction, the Secretary and the NHTSA, from the inception of the Act throughout the pertinent period here, rejected a mandatory airbag restraint system in *61 favor of giving automakers and, thus, consumers, the option of three alternative occupant crash protection systems  airbags, passive seatbelt restraints, and manual shoulder/lap belt combinations. A typical expression of the competing interests and factors considered is contained in the announcement of proposed rule-making on "Occupant Crash Protection" and "Highway Safety Programs Standards" by the Secretary of Transportation on June 14, 1976:
"This decision also involves the difficult task of assessing and comparing the safety benefits and costs of alternative occupant restraint systems. While the legislative history of the Safety Act indicates that safety is the overriding consideration, the cost of a standard must also be examined. Marginal increments in safety benefits which can be achieved only at great costs are not in the public interest" (41 Fed Reg 24070 [1976]).
In 1984, a successor Secretary of Transportation exercised her rule-making authority to again reject imposing a mandatory airbag installation standard, based on a cost/benefit analysis, in favor of retaining the policy of offering manufacturers and the consuming public alternative modes of occupant crash protection (see, State Farm Mut. Auto. Ins. Co. v Dole, 802 F.2d 474, 487-489, cert denied sub nom. New York v Dole, 480 US 951).[1]
Of critical importance to any implied conflict preemption analysis here, Congress, in 1974, confirmed and for all intents and purposes codified, the Secretary's resolution of the competing factors regarding mandatory airbag installation in the Motor Vehicle and School Bus Safety Amendments of 1974 (see, Pub L 93-492, § 109, 88 US Stat 1482 [adding former 15 USC § 1410b (b)-(d)]). That section expressly preserved the option given an automaker in then Federal Safety Standard 208 to install a seatbelt system without airbags, and prohibited the Department of Transportation from mandating airbags unless it first complied with special hearing procedures and submitted the change to Congress for review and possible nullification in advance of adoption.
*62 The conflict is unmistakably clear between Federal statutory and regulatory policy regarding mandatory airbag restraints in motor vehicles during the pertinent period, and the imposition of common-law tort liability based solely on Toyota's failure to install an airbag occupant crash protection system in plaintiffs' vehicle. For plaintiffs to recover on that theory here, a jury must determine that the absence of an airbag in their 1991 Toyota rendered it "not reasonably safe" (Denny v Ford Motor Co., 87 N.Y.2d 248, 257, rearg denied 87 N.Y.2d 969). That issue requires the jury to consider whether "`if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner'" (id., quoting Voss v Black & Decker Mfg. Co., 59 N.Y.2d 102, 108). In making that determination, the jury would be directed to weigh such factors as the product's utility, the likelihood that it will cause injury, the availability of a safer design and the risk, usefulness and cost of alternative designs as compared to the marketed product (id.; see also, PJI 2:141).
Thus, an award of liability in this case for the absence of an installed airbag would require the jury to conclude that the failure to install an airbag in the accident vehicle rendered it unreasonably dangerous, based largely upon the same balancing of costs, risks, benefits and alternative feasible designs, upon which the Department of Transportation and the NHTSA reached a contrary determination, which was then expressly approved and essentially codified by Congress in enacting former 15 USC § 1410b.[2]
The imposition of common-law liability in this case, for failure to install an airbag, would inevitably undermine the regulatory, interest-weighing cost/benefit determination by *63 Congress under the MV Safety Act and amendments, and by Federal regulators in Federal Safety Standard 208 in effect when plaintiffs' vehicle was made and marketed. The Federal resolution was to provide manufacturers and consumers a choice among occupant crash protection systems.
The interference with this Federal scheme through tort liability will be no less severe than would State legislative or regulatory adoption of a mandatory airbag installation rule. As Justice Breyer stated in his concurring opinion in Medtronic:
"The effects of the state agency regulation and the state tort suit are identical. To distinguish between them for pre-emption purposes would grant greater power (to set state standards `different from, or in addition to,' federal standards) to a single state jury than to state officials acting through state administrative or legislative lawmaking processes. Where Congress likely did not focus specifically upon the matter, I would not take it to have intended this anomalous result" (Medtronic, Inc. v Lohr, 518 US, at 504, supra [emphasis supplied] [citations omitted]).
Thus, implied conflict preemption is required here because, although State tort liability for the absence of airbag restraints and Federal standards for occupant crash protection systems both advance the goal of automobile occupant safety, tort liability substantially and inevitably interferes with the method, i.e., flexible, occupant crash protection system options, that was adopted by the Federal Government to achieve that goal (see, International Paper Co. v Ouellette, supra, 479 US, at 494; Guice v Schwab & Co., supra, 89 NY2d, at 48; Pokorny v Ford Motor Co., supra, 902 F2d, at 1124-1125).
Indeed, implied conflict analysis cannot cease where the majority ends it  with the conclusion that tort liability in this situation is consistent with the principal goal of automotive safety  because recognizing a common-law cause of action here interferes with other important components of Congressional and Federal regulatory objectives during the pertinent period, including, specifically, uniformity and the decision to give both manufacturers and consumers a choice of restraint systems (see, S Rep No. 1301, op. cit., 1966 US Code Cong & Admin News 2714; 49 Fed Reg 28962, 28989 [1984] ["the Department recognizes the need for the public to become accustomed to the technology and the need for protection, and believes that an *64 across-the-board mandate too quickly could engender adverse public reaction"]).
As earlier discussed, in Ouellette, the Supreme Court held that Federal pollutant discharge standards under the Clean Water Act (33 USC § 1251 et seq.) preempted common-law nuisance actions, noting that "it is not enough to say that the ultimate goal of both federal and state law is to eliminate water pollution" (International Paper Co. v Ouellette, supra, 479 US, at 494). Likewise, in Guice v Schwab & Co., this Court rejected the notion that because compliance with State common-law disclosure requirements would promote "the same investor-protection purposes of the Federal regulations" there was no preemption of stricter State common-law disclosure requirements by the Securities and Exchange Commission rules (89 NY2d, supra, at 48).
Under Ouellette and Guice, the majority's conclusion that there is no actual conflict because the tort liability imposed here furthers the automotive safety goal of Congress in the MV Safety Act is not a complete answer to the question posed under implied conflict preemption analysis (see, majority opn, at 52-53). Preserving plaintiffs' State common-law no-airbag theory of liability conflicts with the Federal goals, with respect to occupant crash protection, of nationwide uniform application of safety standards and flexibility based upon cost/benefit and consumer acceptance factors. Thus, it seems undeniable that the "full purposes and objectives of Congress" will be undermined (Hines v Davidowitz, supra, 312 US, at 67 [emphasis supplied]).
Put another way, State tort recovery for Toyota's failure to provide an airbag occupant crash protection system in plaintiffs' vehicle must be superseded under the implied conflict preemption doctrine because it would penalize manufacturers for doing "what the [Federal safety standards and Congress] authorized them to do" (see, Chicago & N. W. Transp. Co. v Kalo Brick & Tile Co., supra, 450 US, at 318), and effectively prohibit automakers from availing themselves of a Federally granted option  installation of a manual shoulder and lap seatbelt restraint system (see, Fidelity Fed. Sav. & Loan Assn. v de La Cuesta, supra, 458 US, at 155).
The parallel between Fidelity Fed. Sav. & Loan Assn. v de La Cuesta and the instant case on implied conflict preemption is close. In Fidelity Fed. Sav. & Loan Assn., Federal regulations opted in favor of flexibility in giving Federal savings and loan institutions the choice to include or omit due-on-sale provisions *65 in their mortgage instruments. Here, Federal regulations also opted for flexibility in Federal Safety Standard 208, giving automotive manufacturers the choice to include or omit airbags in occupant crash protection systems. In Fidelity Fed. Sav. & Loan Assn., State courts, applying a State judicially fashioned property doctrine with respect to restraints on alienation, invalidated due-on-sale provisions in such mortgage instruments. The Supreme Court's holding that State law in this respect was superseded under the implied conflict preemption doctrine is equally applicable here:
"Although compliance with both [the Federal option] and the Wellenkamp [State] rule may not be a `physical impossibility' the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely `at its option' and have deprived the lender of the `flexibility' given it by [the Federal regulations]." (Id., at 155 [citations omitted].)

III.

Effect of the Savings Clause on Implied Conflict Preemption
Concededly, the savings clause, relied upon by the majority to reject all forms of preemption in this case is broadly (albeit ambiguously) expressed in stipulating that a manufacturer's compliance with Federal safety standards "does not exempt [it] from any liability under common law" (former 15 USC § 1397 [k]). Nevertheless, I am convinced that the clause does not overcome implied conflict preemption when to do so would demonstrably permit State tort liability to frustrate the "accomplishment and execution of the full purposes and objectives of Congress" (Hines v Davidowitz, supra, 312 US, at 67 [emphasis supplied]).
To construe a savings clause such as this so as to allow survival of a State tort claim actually in conflict with a Federal statutory or regulatory scheme would be unprecedented in United States Supreme Court preemption jurisprudence. Since it can hardly be assumed that Congress would ever intend to honor State law in any form which actually interferes with its own legislative goals, no presumption favoring State law has been applied when the Supreme Court has undertaken implied conflict preemption analysis, even when the subject area is one of traditionally strong State interest (see, Free v Bland, 369 US 663, 666; Taylor v General Motors Corp., supra, 875 F2d, at 826).
*66 Indeed, I would find it unthinkable that this savings clause would be construed to permit imposition of State common-law product liability on a theory, concededly not present here, which would make it impossible for an automaker to comply with both Federal regulatory and State tort standards of care. The necessity for application of implied conflict preemption to override the savings clause under such circumstances is illustrated in a cogent article on the subject (see, Wilton, Federalism Issues in "No Airbag" Tort Claims: Preemption and Reciprocal Comity, 61 Notre Dame L Rev 1, 21-22 [1986]). There, the author posits a case in which plaintiff's claim of design defect is based on the failure of the windshield in an automobile to pop out in a crash, resulting in serious facial injuries upon impact with the windshield. The article points out, however, that Federal Safety Standard 212 (49 CFR 571.212 [1984]) required "that windshields must remain in place during a crash so that occupants are not ejected." The author concludes, "[i]n this circumstance, where the alleged defect is required by federal regulations, preemption doctrine would surely apply to block state common law liability" (Wilton, op. cit., 61 Notre Dame L Rev, at 22 [emphasis in the original]).
Consistent with the foregoing analysis, the Supreme Court has repeatedly refused to apply savings clauses at least as broadly worded as former 15 USC § 1397 (k) to preserve State common-law causes of action which actually interfered with Federal statutory or regulatory policy. Thus, former section 22 of the Interstate Commerce Act (recodified in 49 USC § 15103) stipulated that "[n]othing in this act * * * shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies" (emphasis supplied). In 1907, the Supreme Court held that that savings clause "cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself" (Texas & Pac. Ry. Co. v Abilene Cotton Oil Co., 204 US 426, 446 [emphasis supplied]). And in Chicago & N. W. Transp. Co. v Kalo Brick & Tile Co. (supra), the same savings provision was construed not to obviate implied conflict preemption when to preserve the common-law claim would "impose on common carriers obligations that are plainly inconsistent with the plenary authority of the Interstate Commerce Commission *67 or with congressional policy as reflected in the Act" (450 US, at 318, supra).[3]
In International Paper Co. v Ouellette, despite clauses providing that "noting in this chapter shall * * * be construed as impairing * * * any right or jurisdiction of the States with respect to the waters * * * of such States" and that "[n]othing in this section shall restrict any right * * * under any statute or common law" (479 US, at 485, supra), the Court held that the Clean Water Act (33 USC § 1251 et seq.), preempted a Vermont common-law nuisance suit based upon pollutant discharges from the New York side of Lake Champlain. And in Guice v Schwab & Co. (supra), our Court similarly rejected the contention that implied conflict preemption was forestalled by section 28 (a) of the Securities Exchange Act which provided that the Federal statute's rights and remedies are "in addition to any and all other rights and remedies that may exist at law or in equity" (89 NY2d, at 49, supra [emphasis supplied]).
Neither plaintiffs nor the majority have demonstrated any substantive differences between the savings clauses in the foregoing cases and former section 1397 (k) of the MV Safety Act here. Therefore, to the extent that the majority relies upon the savings clause of the MV Safety Act to overcome implied conflict preemption in this case, its position is itself inconsistent with the precedents of the United States Supreme Court and of this Court.
For all of the foregoing reasons, I would reverse and grant the Toyota defendants partial summary judgment, dismissing so much of the complaint as relies upon the absence of an installed airbag as the basis of plaintiffs' product liability causes of action.
Order affirmed, etc.
NOTES
[1] Another consideration that was weighed in the balance of imposing a mandated airbag restraint system was intense public resistance, which was feared might result in a dismantling, or total rejection of accident crash protection systems by consumers, and the resultant disastrous effect on automotive safety (see, id., 802 F2d, at 487; see also, 49 Fed Reg 28962, 28993 [1984]).
[2] Significantly, in Medtronic, in finding no preemption the Supreme Court relied heavily on the fact that no similar risk/benefit analysis had been undertaken by the Government agency and that the FDA had taken the position that common-law claims were not preempted (see, Medtronic, Inc. v Lohr, 518 US 470, 496-497, 501, supra). By contrast, as to the pertinent issue here, the Federal Government has consistently taken the position that common-law no-airbag claims are preempted (see, Brief for United States as amicus curiae supporting respondents, at 28-29, Freightliner Corp. v Myrick, 514 US 280, No. 94-286; Brief for United States as amicus curiae, at 13-17, Ritt v General Motors Corp., 7th Cir, No. 88-1822; Brief for United States as amicus curiae, Wood v General Motors Corp., 865 F.2d 395, cert denied 494 US 1065, US Sup Ct, No. 89-46). And, as the above discussion reveals, the Department of Transportation here has "weighed the competing interests," making this a case in the words of the Supreme Court, "quite unlike" Medtronic (Medtronic, Inc. v Lohr, 518 US, at 501, supra).
[3] A broad savings clause, such as included in the Interstate Commerce Act or the MV Safety Act, may be more appropriately interpreted as negating implied field preemption but not conflict preemption (see, Pennsylvania R. R. Co. v Puritan Coal Min. Co., 237 US 121, 130; Guice v Schwab & Co., supra, 89 NY2d, at 49-50).